**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WESTERN PA CHILD CARE, LLC, | : |
| PA CHILD CARE, LLC, MID-ATLANTIC | : |
| YOUTH SERVICES CORP., CONSULTING | : |
| INNOVATIONS AND SERVICES, INC., | : |
| GLADSTONE PARTNERS, LP and GREGORY R. | : |
| ZAPPALA, | : |
| | : |
| Plaintiffs | : |
| v. | : |
| | : |
| ROBERT J. POWELL, DEBRA POWELL, | : |
| JILL MORAN, THE POWELL LAW GROUP, | : |
| P.C., VISION HOLDINGS, LLC, JANE SEBELIN, | : |
| SEBELIN LAW OFFICES, P.C.,  JONATHAN | : |
| LANG; MATTHEW SLOCUM, and THE | : |
| SLOCUM FIRM, P.C., | : |
| Defendants | : |

COMPLAINT IN CIVIL ACTION

AND NOW, come Plaintiffs, Western PA Child Care, LLC ("WPACC"), PA Child Care, LLC

("PACC"), Mid-Atlantic Youth Services Corp. ("MAYS"), Consulting Innovations and Services,

Inc. ("CIS"), Gladstone Partners, L.P. ("Gladstone"), and Gregory R. Zappala, ("Mr. Zappala")

and make this complaint in civil action against Robert J. Powell ("Robert Powell"), Debra

Powell ("Debra Powell"), Jill Moran ("Moran"), The Powell Law Group, P.C. ("PLG"), Vision

Holdings, LLC ("Vision Holdings"), Jane Sebelin ("Jane Sebelin"), Sebelin Law Offices, P.C

("Sebelin Law Offices") , Jonathan Lang ("Lang"), Matthew Slocum ("Matthew Slocum") and

The Slocum Firm, P.C.) ("Slocum Firm") and in support thereof aver as follows:

I.      FACTS

1.      Robert Powell, a convicted criminal and disbarred attorney, induced Mr. Zappala into

business relationships for the purpose of plundering the Plaintiffs of millions of dollars that

Robert Powell used to assure the success of PLG (his law firm) by bribing Luzerne County, Pennsylvania, Court of Common Pleas officials for favorable rulings, paying PLG's operating costs and litigation costs and lining his pockets with the booty.

2.     In doing so, Robert Powell, Moran and PLG, with their codefendants and their co-conspirators thoroughly corrupted the administration of civil justice in Luzerne County, Pennsylvania, from at least 2001 until at least 2008; ruined the Plaintiffs' reputations; stole millions of dollars from Plaintiffs; and burdened Mr. Zappala, PACC, WPACC and MAYS with crushing debt and litigation costs in the United States District Court for the Middle District of Pennsylvania ("Middle District Litigation").

3.     The criminal enterprises that Robert Powell built, participated in and reigned over included:

a.     an association-in-fact comprised of: (i) Robert Powell, (ii) Vision Holdings, a Pennsylvania limited liability company owned by Robert Powell and Debra Powell, (iii) PLG, a Pennsylvania professional corporation, (iv) Robert Powell's law partner, Moran (who together with Robert Powell were the directors, officers and shareholders of PLG), (v) Luzerne County, Pennsylvania, Court of Common Pleas Judges Mark Ciavarella ("Ciavarella" or "Judge Ciavarella") and Michael Conahan ("Conahan" or "Judge Conahan"), (vi) developer Robert Mericle ("Robert Mericle"), (vii) Mericle Construction, Inc., ("Mericle Construction") owned by Robert Mericle, (viii) Beverage Marketing, Inc. ("Beverage Marketing"), a Pennsylvania corporation owned by Conahan and (ix) Pinnacle Group of Jupiter, LLC ("Pinnacle"), a Florida limited liability company owned by Ciavarella's wife and Conahan's wife but controlled by Ciavarella and Conahan;

b.     the following legal entities:

2

     i.       the Court of Common Pleas of Luzerne County, Pennsylvania;

     ii.      the Office of the Prothonotary of Luzerne County, Pennsylvania;

     iii.    Robert Powell's law firm, PLG;

     iv.    Vision Holdings;

     v.     Mericle Construction;

     vi.    Beverage Marketing; and,

     vii.   Pinnacle.

A.    THE FOUR PART FINDER'S FEE SCHEME

    1.    The PACC Facility Construction Finder's Fee Scheme

4.     In 1999, Judge Conahan convened a meeting of a group of political cronies, including Judge Ciavarella and Robert Powell, to devise a plan to replace the dilapidated Luzerne County juvenile detention center on River Street, in Wilkes-Barre, Pennsylvania (the "River Street Summit").

5.     Conahan invited Robert Powell to the River Street Summit even though Robert Powell had no discernible, useful skills or experience for the task (but he was Conahan's trusted friend and protégée).

6.     At that time, Mr. Zappala was an investment banker particularly active in municipal bond work, who had met Robert Powell in that capacity.

7.     In 1999, Robert Powell informed Mr. Zappala of an opportunity to build a juvenile detention and treatment facility in Northeastern Pennsylvania with the goal to either rent or sell the facility to a public agency.

8.     After due diligence, Mr. Zappala determined that there was a need for such a regional facility in Northeastern Pennsylvania.

3

9.      Robert Powell scouted for land in Northeastern Pennsylvania and a builder for such a facility and in May 2001 caused PACC to be formed.

10.     Following the River Street Summit, Ciavarella, then the Luzerne County Juvenile Court Judge, put Robert Mericle, the owner and president of Mericle Construction, in touch with Robert Powell about building a juvenile detention facility in Luzerne County.

11.     Robert Mericle had been funneling to Ciavarella at least $5,000 per year in cash or kind since Ciavarella was elected as a judge to the Luzerne County Court of Common Pleas.

12.     Robert Powell asked Robert Mericle to provide an estimate of the costs to construct the juvenile facility for PACC's use in obtaining financing.

13.     In July 2001, Robert Powell (while working in concert with Conahan after the River Street Summit meeting) demanded that Robert Mericle pay Robert Powell $1.0 million in order to secure the construction contract for Mericle Construction to build the juvenile detention and treatment facility for PACC (the "PACC Facility").

14.     In June 2001, Robert Mericle had estimated the construction costs for the PACC Facility, and in July 2001 falsely inflated the costs by $1.0 million in order to provide the $1.0 million demanded by Robert Powell.  The list of costs in Robert Mericle's estimate did not disclose the $1.0 million payment to Robert Powell and did not include a line item for the payment to Robert Powell.

15.     Robert Mericle, in turn, informed Ciavarella about Robert Powell's demand for $1.0 million.  Robert Mericle told Ciavarella that it was Ciavarella who deserved the money and offered Ciavarella the $1.0 million as a "finder's fee" from the PACC Facility construction contract.

4

16.     Ciavarella accepted the offer from Robert Mericle and then went to Conahan and offered to split the $1.0 million finder's fee with him, since Conahan had put together the people necessary to build the replacement for the River Street Facility.

17.     Conahan, pretending that he did not know about Robert Powell's demand for the $1.0 million from Robert Mericle, accepted the offer and said "That is a heck of a friend you have."

18.     In September 2001, Vision Holdings (owned by Robert Powell and Debra Powell) and CIS (owned by Mr. Zappala) formally organized PACC, when they signed the PACC Operating Agreement to build and own the PACC Facility in Luzerne County.

19.     Mr. Zappala pursued financing for the PACC Facility.

20.     None of Robert Mericle, Mericle Construction, Ciavarella, Conahan, or Robert Powell, who demanded, knew of and approved of the $1.0 million finder's fee, ever disclosed $1.0 million finder's fee to Mr. Zappala.

21.      In 2001, based upon Robert Mericle's falsely inflated estimate, PACC awarded the construction contract for the PACC Facility to Mericle Construction ("PACC Facility Construction Contract") that included the $1.0 million finder's fee concealed by Mericle Construction and Robert Mericle in the PACC Facility Construction Contract's hard costs.

22.     On or about December 24, 2001, Conahan (knowing of both Robert Powell's demand of the $1.0 million from Robert Mericle and, in turn, Robert Mericle's offer of the $1.0 million finder's fee to Ciavarella) told Robert Powell that "we" are going to have to take care of Ciavarella for his part in the PACC Facility construction scheme.

23.     At this point, Robert Powell could have withdrawn from the conspiracy without financial consequences to Plaintiffs, but did not.

24.     In February 2002, the final PACC Facility Construction Contract was prepared by Robert Mericle and Mericle Construction and presented it to PACC for execution.

25.      The PACC Facility Construction Contract included a detailed list of Base Building Hard Costs that, with Robert Powell's knowledge and consent and pursuant to Robert Powell's demand, were falsely inflated by $1.0 million to pay the $1.0 million finder's fee. The PACC Facility Construction Contract's detailed list of Base Building Hard Costs did not disclose the $1.0 million padding or include a specific line item for a "finder's fee".

26.     The enormous $1.0 million finder's fee representing approximately twenty-two percent (22%) of the actual hard costs needed to construct the PACC Facility was concealed in the PACC Facility Construction Contract's Base Building Hard Costs,  was greater than every detailed line item in Base Building Hard Costs disclosed in the PACC Facility Construction Contract (except masonry and flashings of $1.2 million), and, astonishingly, exceeded Mericle Construction's combined overhead and profit. Hard costs for an item as small as $6,000 for "Overhead Door and Bumpers" were disclosed in the PACC Facility construction contract's hard cost detail while the $1.0 million finder's fee was not disclosed.

27.     On February 19, 2002, Robert Powell, as a member of Vision Holdings, which was a member of PACC, and Robert Mericle, for Mericle Construction, executed the falsely inflated PACC Facility Construction Contract.

28.     In or around February, 2002, with Robert Powell's knowledge and consent, the PACC Facility Construction Contract with the concealed $1.0 million finder's fee, was submitted to S&T Bank of Indiana County, Pennsylvania, in this District, in order to induce S&T Bank to lend money to PACC to construct the PACC Facility.

6

29.     None of Robert Mericle, Mericle Construction, Ciavarella, Conahan or Robert Powell, who all knew that PACC would rely upon the falsely inflated PACC Facility Construction Contract to make a loan application to S&T Bank and that S&T Bank would rely on the PACC Facility Construction Contract in its determination to make the loan, disclosed the $1.0 million finder's fee to S&T Bank, PACC or Mr. Zappala.

30.     On or around February 19, 2002, Robert Mericle drafted and caused to be delivered to Robert Powell at PLG's offices, and Robert Powell, while at PLG's offices, signed a Registration and Commission Agreement for the payment of a finder's fee of $997,600 to Robert Powell, as an attorney. This document memorialized the payment of the intended $1.0 million finder's fee to Robert Powell, only $2,400 shy of their $1.0 million finder's fee target.

31.     On or about March 1, 2002, Robert Powell and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings) individually and on behalf of Vision Holdings attended and participated in PACC's loan closing with S&T Bank that occurred in Pittsburgh, Pennsylvania, in this District, where they signed and submitted to S&T Bank loan closing documents.

32.     In reliance on the fraudulent PACC Facility Construction Contract and the loan closing documents, S&T Bank loaned $10.0 million (which included the concealed $1.0 million finder's fee) to PACC to fund the construction of the PACC Facility.

33.     On or about January 7, 2003, Robert Mericle drafted and caused to be delivered to Robert Powell at PLG offices, a Final Acceptance Letter for the PACC Facility Construction Contract. Robert Powell, while at PLG's offices, signed Robert Mericle's Final Acceptance Letter for the PACC Facility Construction Contract in order that S&T Bank would release to Mericle

Construction the funds remaining on PACC's $10.0 million S&T Bank construction loan, and thereby trigger the payment of the $997,600 finder's fee to Robert Powell as an attorney.

34.     On or around January 16, 2003, Robert Powell, while at PLG's offices, directed PLG employee Maylene Cunfer to draft, and Robert Powell signed and caused to be delivered to Robert Mericle and Mericle Construction in a PLG envelope marked "Personal/Confidential" a letter ("Powell's 2003 Payment Letter") directing the wire transfer of the $997,600 finder's fee for Robert Powell, Ciavarella and Conahan to be paid in part to the escrow account of attorney Robert E. Matta ("Matta") of Schuylkill County, Pennsylvania, and the other part to a bank account of PLG.

35.     To this end, Robert Mericle, Mericle Construction, Robert Powell and PLG actively cloaked their payment of the finder's fee to Ciavarella and Conahan as follows:

     a. On or around January 21, 2003, pursuant to Powell's 2003 Payment Letter, Robert Mericle caused Mericle Construction's bank to send two (2) wire transfers for funds totaling $997,600.00 from Mericle Construction's bank account. One wire transfer in the amount of $387,600 went to PLG's bank account, and the other wire transfer in the amount of $610,000 went to Matta's attorneys' escrow account at Minersville Bank, where Matta was a bank officer. Robert Powell and Matta were well acquainted, for in April 2002, shortly after Robert Powell signed the February 19, 2002 Registration and Commission Agreement with Mericle Construction as part of the PACC Finder's Fee scheme, Vision Holdings borrowed $150,000.00 from Minersville Bank. Matta was involved with the Minersville Bank loan.

     b. Robert Powell kept $387,600 of the finder's fee wire transferred from Mericle Construction to PLG, and used some of the proceeds to repay Minersville Bank the April 2002 $150,000 loan on behalf of  Vision Holdings.

8

c. On or about January 28, 2003, at Conahan's direction, Matta had Minersville Bank wire transfer the $610,000 that Matta had received in his attorneys' escrow account from Mericle Construction pursuant to Powell's 2003 Payment Letter, to the bank account of Beverage Marketing, a corporation that Conahan owned.

d. On or about January 28, 2003, Beverage Marketing directed its bank to wire transfer $330,000 to a bank account under Ciavarella's control.

e. On or about April 30, 2003, Beverage Marketing directed its bank to wire transfer $75,000 to a bank account under Ciavarella's control.

f. On or about July 15, 2003, Beverage Marketing directed its bank to wire transfer $75,000 to a bank account under Ciavarella's control.

g. On or about August 13, 2003, Beverage Marketing directed its bank to wire transfer $25,000 to a third party's bank account.

h. On or about August 21, 2003, Beverage Marketing directed its bank to transfer $105,000 from Beverage Marketing's account to an account under the control of Conahan.

i. Sometime between January 21, 2003 and August 29, 2003, Robert Powell caused $326,000 to be transferred from PLG's bank account into Vision Holdings' bank account.

j. On or about August 29, 2003, Vision Holdings, at the direction of Robert Powell and Debra Powell (through Robert Powell, whom Debra Powell appointed as her agent-in-fact to operate Vision Holdings) wrote a check in the amount of $326,000 to Robert Powell, which Robert Powell endorsed and gave to Conahan.

k. Robert Powell kept $60,000.

36. On or about January 2004, Robert Mericle caused Mericle Construction to issue a Form 1099 for tax year 2003 to Robert Powell for Robert Powell's share of the $387,600 finder's fee,

deposited the Form 1099 in the United States mail addressed to Robert Powell at PLG's offices, and Robert Powell, while at PLG's offices took the Form 1099 from the United States mail. Similarly, Robert Mericle caused Mericle Construction to issue a Form 1099 to Matta for $610,000 for the other part of the $997,600 finder's fee, deposited the Form 1099 in the United States Mail and Matta took the Form 1099 from the United States mail.

37.     Robert Powell and Robert Mericle took these actions to put a gloss of legitimacy on the U.S. income tax deduction that Mericle Construction claimed for the $997,600 payment. The $997,600 in payments were actually kickbacks and bribes to Robert Powell, Ciavarella and Conahan that were not deductible for U.S. income tax purposes. Robert Powell and Mericle agreed to put a "finder's fee" label on the $997,600 payment in order to support a deceptive U.S. income tax deduction for Mericle Construction. Robert Powell and Robert Mericle had concealed the illicit $997,600 payment in falsely inflated Base Building Hard Costs in the PACC Facility Construction Contract. However, Mericle Construction had never incurred the $997,600 in hard costs in constructing the PACC Facility and thus it did not have a corresponding legitimate hard cost expense to offset $997,600 in income that Mericle Construction received from PACC under the PACC Facility Construction Contract.  Accordingly, Mericle Construction needed an additional $997,600 in U.S. income tax deductions or Mericle Construction's taxable net profits on the PACC Facility Construction Contract would balloon upward by $997,600, which, in turn, would cost it about another $350,000 in U.S. income taxes (35% tax rate x $997,600). In other words, if the $997,600 illicit payment to Robert Powell, Conahan and Ciavarella was not deductible by Mericle Construction for U.S. income tax purposes, then it would really cost Mericle and Mericle Construction $1,347,600 ($997,600 nondeductible payment plus $350,000 in additional U.S. income taxes) to make the illicit payment. Moreover,

Mericle would need to explain to Mericle Construction's independent financial auditors and tax return preparers why Mericle Construction's enormous $997,600 payment was not tax deductible.

38.     By issuing the false Form 1099s, Mericle Construction created a false $997,600 U.S. income tax deduction, reduced the cost of its illicit payment in net after tax dollars to $647,600 ($997,600 payment less $350,000 in U.S. income tax savings from deducting the $997,600 illicit payment), and created an explanation for its tax deception. Thus, by taking the false Form 1099s from the United States mail and paying U.S. income taxes thereon, Robert Powell further advanced the PACC Facility Construction Finder's Fee Scheme and helped Mericle Construction to avoid federal income tax.

39.     It should be noted that even if Mericle Construction would have properly refrained from claiming the $997,600 U.S. income tax deduction for the illicit payment, Robert Powell, Conahan and Ciavarella would still have been required to report the $997,600 illicit payment as income and pay U.S. income taxes on it anyway. Bribes and kickbacks are income to the recipients even though the bribe payer is not permitted to claim a tax deduction for such payments. This scheme therefore harmed the Plaintiffs and cost the United States about $350,000 in lost revenue from the U.S. income taxes as a result of Mericle Construction claiming the illicit $997,600 payment as a U.S. income tax deduction since the deduction was not permitted and never should have been claimed.

40.     The PACC Facility opened in February 2003; PACC leased the PACC Facility to Luzerne County for $2.9 million per year for 20 years, beginning in January 2005; and, MAYS began operating the PACC Facility in or around May 2005 pursuant to a contract with Luzerne County.

41.     On June 16, 2005, Robert Powell paid Matta $10,000 of PACC's money for Matta's participation in the PACC Facility Finder's Fee Scheme.

2.     The WPACC Facility Construction Finder's Fee Scheme

42.     In 2003, CIS and Vision Holdings, as equal members, formed WPACC to pursue construction of a regional juvenile treatment facility in Western Pennsylvania ("WPACC Facility").

43.     On the heels of their initial success, Robert Powell, Robert Mericle, Mericle Construction, Ciavarella and Conahan reused the successful PACC Facility Finder's Fee Scheme for the construction of the WPACC Facility and two later construction projects as follows: (i) construction of an addition to the PACC Facility beginning in or about Spring 2005; and, (ii) construction of an addition to the WPACC Facility beginning in or about Spring 2007.

44.     S&T Bank was the lender for each of these three projects.

45.     In June 2004, the final WPACC Facility construction contract was prepared by Robert Mericle and Mericle Construction and presented to WPACC for execution ("WPACC Facility Construction Contract").

46.     The WPACC Facility Construction Contract included a detailed list of Base Building Hard Costs that, with Robert Powell's knowledge and consent, were falsely inflated by $1.0 million to pay a $1.0 million finder's fee.  The WPACC Facility Construction Contract's detailed list of Base Building Hard Costs did not disclose the $1.0 million false inflation or include a specific line item in the detailed costs for a "finder's fee".

47.     The enormous $1.0 million finder's fee representing approximately thirteen percent (13%) of the actual hard costs for the WPACC Facility was concealed in the WPACC Construction Contract's Base Building Hard Costs, was greater than every detailed line item for

the Base Building Hard Costs disclosed in the WPACC Facility Construction Contract (except masonry and flashings of $1.8 million), while detailed hard costs for a line item as small as $500 for "Maglocks on Fence" were disclosed. The enormous $1.0 million finder's fee was almost two-and-a-half times larger than Mericle Construction's profit, yet the $1.0 million finder's fee was not disclosed.

48.     Robert Powell, as a member Vision Holdings, which was a member of WPACC, and Robert Mericle, for Mericle Construction, executed the falsely inflated WPACC Facility Construction Contract on June 8, 2004.

49.     In or around June 8, 2004, with Robert Powell's knowledge and consent, the WPACC Facility Construction Contract with the concealed $1.0 million finder's fee, was submitted to S&T Bank of Indiana County, Pennsylvania, in this District, in order to induce S&T Bank to lend money to WPACC to construct the WPACC Facility.

50.     None of Robert Mericle, Mericle Construction, Ciavarella, Conahan or Robert Powell, who knew that WPACC would rely upon the falsely inflated WPACC Facility Construction Contract to make a loan application to S&T Bank and that S&T Bank would rely on the WPACC Facility Construction Contract in its determination to make the loan, disclosed the $1.0 million finder's fee to S&T Bank, WPACC or Mr. Zappala.

51.     On or about June 10, 2004, Robert Powell and Debra Powell individually and on behalf of Vision Holdings attended and participated in WPACC's loan closing with S&T Bank that occurred in Pittsburgh, Pennsylvania, in this District, and signed and submitted to S&T Bank loan closing documents.

52.     In reliance on the fraudulent WPACC Facility Construction Contract and the closing documents, S&T Bank loaned $14.0 million (which included the concealed $1.0 million finder's fee) to WPACC to fund the construction of the WPACC Facility.

53.     Robert Mericle drafted a Registration and Commission Agreement on or around June 8, 2004, and on June 24, 2005 drafted a Final Acceptance Letter for final approval of the WPACC Facility construction and wire transfer instructions for the $1.0 million finder's fees.

54.     On or about July 13, 2005, Robert Mericle and Mericle Construction caused the Registration and Commission Agreement, the Final Acceptance Letter, and the wire transfer instructions to be telefaxed from Pennsylvania to Robert Powell in Florida.  On July 14, 2005, Robert Powell, while in Florida, signed (i) the Registration and Commission Agreement for the payment of the finder's fee of $1.0 million to Robert Powell, as an attorney, (ii) the Final Acceptance Letter and (iii) the wire transfer instructions. On July 14, 2005, Robert Powell then deposited the Registration and Commission Agreement, the Final Acceptance Letter, and the wire transfer instructions with a commercial carrier for return delivery to Robert Mericle in Pennsylvania.

55.     On or about July 15, 2005, Robert Mericle took from the commercial carrier the Registration and Commission Agreement, the Final Acceptance Letter, and the wire transfer instructions that Robert Powell had sent to him.

56.     The Final Acceptance Letter for the WPACC Facility construction triggered the payment of the $1.0 million finder's fee for the construction of the WPACC Facility under the Registration and Commission Agreement.

57.     In or around July 2005, Robert Mericle and Mericle Construction, in accordance with Robert Powell's wire transfer instructions, paid the $1.0 million WPACC Facility finder's fee to Ciavarella and Conahan.

58.     To cloak the payment of the $1.0 million WPACC finder's fee, the wire transfer instructions that Robert Powell sent to Robert Mericle on or about July 15, 2005, directed Robert Mericle and Mericle Construction to the pay the $1.0 million finder's fee by wire transfer to Pinnacle, a company ostensibly owned by Ciavarella and Conahan's wives, but controlled by Ciavarella and Conahan.

59.     On or about January 2006, Robert Mericle caused Mericle Construction to issue a Form 1099 for tax year 2005 to Pinnacle for the $1.0 million finder's fee, deposited the Form 1099 in the United States mail addressed to Pinnacle and Pinnacle received  the Form 1099 in the United States mail.

60.     Robert Powell and Robert Mericle took these actions to put a gloss of legitimacy on the U.S. income tax deduction that Mericle Construction claimed for the $1.0 million illicit payment as a tax scam for the same reasons and with the same results as set forth in paragraphs 37-39, above. Robert Powell helped cheat the United States out of another $350,000 in tax revenue.

                3.      The PACC Facility Addition Construction Finder's Fee Scheme

61.     In or around January 2005, PACC decided to build an addition to the PACC Facility ("PACC Addition").

62.     In February 2005, the final "PACC Addition Construction Contract" was prepared by Robert Mericle and Mericle Construction and presented to PACC for execution.

63.     The PACC Addition Construction Contract included a detailed list of Base Building Hard Costs that, with Robert Powell's knowledge and consent, were falsely inflated by $150,000 to

pay a $150,000 finder's fee. The PACC Addition Construction Contract's detailed list of Base Building Hard Costs did not disclose the padding or include a specific line item for a "finder's fee".

64.      The enormous $150,000 finder's fee representing approximately twenty-six percent (26%) of the actual construction costs to build the PACC Addition was concealed in the PACC Addition Construction Contract's Base Building Hard Costs for the PACC Addition, was greater than every detailed line item for the Base Building Hard Costs disclosed in the PACC Addition Construction Contract (except masonry and flashings of $185,000), while a detailed hard costs for a line item as small as $800 for "General Conditions-Reimbursables" was disclosed. The enormous $150,000 finder's fee was four-times greater than Mericle Construction's profit, yet the finder's fee was not disclosed.

65.      Robert Powell, as a member of Vision Holdings, which was a member of PACC, and Robert Mericle, for Mericle Construction, executed the falsely inflated PACC Addition Construction Contract on February 24, 2005.

66.      In or around February 2005, with Robert Powell's knowledge and consent, the PACC Addition Construction Contract with the concealed $150,000 finder's fee was submitted to S&T Bank of Indiana County, Pennsylvania, in this District, in order to induce S&T Bank to lend money to PACC to construct the PACC Addition.

67.      None of Robert Mericle, Mericle Construction, Ciavarella, Conahan or Robert Powell, who knew that PACC would rely upon the falsely inflated PACC Addition Construction Contract to make a loan application to S&T Bank and that S&T Bank would rely on the PACC Addition Construction Contract in its determination to make the loan, disclosed the $150,000 finder's fee to S&T Bank, PACC or Mr. Zappala.

16

68.     On or about June 22, 2005, Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings) and Vision Holdings participated in the PACC Addition loan closing with S&T Bank by sending by United States Mail or commercial courier their signed loan documents to S&T Bank which were delivered to S&T Bank in Indiana County, Pennsylvania, in this District.

69.     In reliance on the fraudulent PACC Addition Construction Contract and the closing documents, S&T Bank loaned $1.4 million (which included the concealed $150,000 finder's fee) to PACC to fund the construction of the PACC Addition.

70.     On or around February 2005, Robert Mericle drafted and caused to be delivered to Robert Powell at PLG's offices, and Robert Powell, while at PLG's offices, signed a Registration and Commission Agreement for the payment of the $150,000 finder's fee to Robert Powell, as an attorney.

71.     In or around February 2006, Robert Mericle drafted and delivered to Robert Powell at PLG's offices, a Final Acceptance Letter, and Robert Powell, while at PLG's offices, signed the Final Acceptance Letter for the PACC Addition construction in or around February 2006, thereby triggering the payment of the $150,000 finder's fee for the construction of the PACC Addition under the Registration and Commission Agreement.

72.     In or around February 2006, Robert Mericle and Mericle Construction, at Robert Powell's direction, paid the $150,000 finder's fee to Ciavarella and Conahan by wire transfer.

73.     To cloak the payment of the $150,000 PACC Addition finder's fee to Ciavarella and Conahan, Robert Powell, by a writing done at PLG's offices, directed Robert Mericle and Mericle Construction to pay the finder's fee by wire transfer of $150,000 to Pinnacle, a company ostensibly owned by the Judges' wives but controlled by the Judges.

17

74.     On or about January 2007, Robert Mericle caused Mericle Construction to issue a Form 1099 for tax year 2006 to Pinnacle for the $150,000 finder's fee, deposited the Form 1099 in the United States mail addressed to Pinnacle and Pinnacle received the Form 1099 in the United States mail.

75.     Robert Powell and Robert Mericle took these actions to put a gloss of legitimacy on the U.S. income tax deduction that Mericle Construction claimed for the $150,000 illicit payment as a tax scam for the same reasons and with the same results as set forth in paragraphs 37-39 and 69-60, above. Robert Powell helped cheat the United States out of another $52,500 (35% x $150,000) in tax revenue.

> 4.     The WPACC Facility Addition Construction Finder's Fee Scheme

76.     In or around July 2007, WPACC decided to build an addition to the WPACC Facility ("WPACC Addition").

77.     In or around August 2007, the "WPACC Addition Construction Contract" was prepared by Robert Mericle and Mericle Construction and presented to WPACC for execution.

78.     The WPACC Addition Construction Contract included a detailed list of Base Building Hard costs that, with Robert Powell's knowledge and consent, were falsely inflated by $150,000 to pay a $150,000 finder's fee, yet it did not disclose the $150,000 of padding or include a specific line item for a "finder's fee".

79.     The enormous $150,000 finder's fee representing approximately thirteen percent (13%) of the actual costs to construct the WPACC Addition was concealed in the WPACC Addition Construction Contract's Base Building Hard Costs, was greater than every detailed line item for the Base Building Hard Costs disclosed in the WPACC Addition Construction Contract (except masonry and flashings of $344,000 and HVAC of $156,484), while detailed hard costs for a line

18

item as small as $3,200 for "Millwork" was disclosed. The enormous $150,000 finder's fee was more than two-times greater than Mericle Construction's profit, yet the finder's fee was not disclosed.

80.     Robert Powell, as a member of Vision Holdings, which was a member of WPACC, and Robert Mericle, for Mericle Construction, executed the falsely inflated WPACC Addition Construction Contract on or about August 29, 2007.

81.     In or around August 2007, with Robert Powell's knowledge and consent, the WPACC Addition Construction Contract with the concealed $150,000 finder's fee was submitted to S&T Bank of Indiana County, Pennsylvania, in this District, in order to induce S&T Bank to lend money to WPACC to construct the WPACC Addition.

82.     None of Robert Mericle, Mericle Construction, Ciavarella, Conahan or Robert Powell, who knew that WPACC would rely upon the falsely inflated WPACC Addition Construction Contract to make a loan application to S&T Bank and that S&T Bank would rely on the WPACC Addition Construction Contract in its determination to make the loan, disclosed the $150,000 finder's fee to S&T Bank, WPACC or Mr. Zappala.

83.     On or about December 11, 2007, Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings) and Vision Holdings participated in WPACC Addition loan closing with S&T Bank by sending signed loan closing documents by United States Mail or commercial carrier to S&T Bank which were delivered to S&T Bank in Indiana County, Pennsylvania, in this District.

84.     In reliance on the fraudulent WPACC Addition Construction Contract and the closing documents, S&T Bank loaned $2.4 million (which included the concealed $150,000 finder's fee) to WPACC to fund the construction of the WPACC Addition.

85.     Robert Mericle drafted, however no one signed, a Registration and Commission Agreement or Final Acceptance Letter for the WPACC Addition.

86.     Robert Powell did not sign the Registration and Commission Agreement for the WPACC Addition only because he had learned of a Federal Grand Jury investigation into the corruption of the Luzerne County Court of Common Pleas.

87.     No one signed the Final Acceptance Letter for the WPACC Addition because Mr. Zappala learned of the W-CAT, Inc. scheme involving Robert Powell, Moran, Ciavarella and Conahan, described below, after which Mr. Zappala, PACC, WPACC and MAYS immediately parted ways with Robert Powell and Vision Holdings. The $150,000 finder's fee for the WPACC Addition project was not paid.

88.     Robert Mericle and Mericle Construction included undisclosed finder's fees of: $997,600 in the PACC Facility Construction Contract, $1.0 million in the WPACC Facility Construction Contract, and $150,000 in each of the PACC Addition Construction Contract and WPACC Addition Construction Contracts, for a total of $2,297,600 of finder's fees padded into the construction contract hard costs for the four projects ("Total Finder's Fees").

89.     Robert Mericle and Mericle Construction added eleven percent (11%) for overhead onto the $2,297,600 Total Finder's Fees hidden in the four projects construction Base Building Hard Costs, resulting in an additional charge of unearned and unnecessary overhead of $252,736 (11% x $2,297,600 Total Finder's Fees)("Total Unearned and Unnecessary Overhead"). Moreover, in addition to the Total Unearned and Unnecessary Overhead, Robert Mericle and Mericle Construction added another five percent (5%) for profit onto the Total Finder's Fees of $2,297,600 plus Total Unearned and Unnecessary Overhead of $252,736 (totaling  $2,550,336), for Fictional Profits of $127,517 of (5% x $2,550,336); resulting in grand total of $2,677,853 of

false charges ("Total False Charges") to PACC and WPACC for the undisclosed Total Finder's Fees, Total Unnecessary and Unearned Overhead and Fictional Profits concealed in the four PACC and WPACC construction contracts Bas Building Hard Costs, overhead and profits.

90.      PACC and WPACC borrowed $28,590,000 that they otherwise would not have borrowed, incurred Total False Charges of $2,677,853 to construct or add to the PACC and WPACC Facilities, and have partially repaid and must fully repay the entire $28,590,000 plus interest thereon, which includes the Total False Charges of $2,677,853, because of the Defendants' Finder's Fee Schemes.

91.      Mr. Zappala had to guaranty the S&T Bank loans to PACC and WPACC, of which $2.0 million are still outstanding, because of the Defendants' Finder Fee Schemes.

92.      S&T Bank's security in the PACC and WPACC's Facilities is understated by the Total False Charges of $2,677,853 because of the Defendants' Finder's Fee Schemes.

93.      PACC, WPACC, MAYS and Mr. Zappala were sued by hundreds of children and their parents in the United States District Court for the Middle District of Pennsylvania ("Middle District Litigation") because of what the Defendants did, and have expended or incurred in excess of $3.0 million in attorneys' fees and litigation costs; PACC and WPACC have paid $600,000 to settle the Middle District Litigation, and PACC and WPACC must pay an additional $1.9 million to settle the Middle District Litigation.

       B.     THE W-CAT SCHEME

94.      In or around 2001, Robert Powell, Moran and Conahan entered into the land development business and constructed townhouses located in Mountaintop, Luzerne County, Pennsylvania.

95.     Robert Powell and Moran formed a corporation, W-CAT, Inc. ("W-CAT"), with its business address at the then mailing address of PLG's offices, and W-CAT took out loans amounting to $4.0 million to fund the development.

96.      Robert Powell, Debra Powell, Conahan and his wife, Barbara Conahan, and Moran personally guaranteed the bank loans to W-CAT.

97.     In or about 2004, Ciavarella and his wife, Cynthia Ciavarella, also became personal guarantors of W-CAT's bank loans.

98.     Upon the foregoing information and belief, the various W-CAT bank loan guarantors were willing to take this risk only because the proceeds from the Finder's Fee Schemes and the income of MAYS, PACC, WPACC and Gladstone were accessible to them through Robert Powell, Moran, Vision Holdings, and PLG.

99.     Each of the guarantors obtained the right to either a W-CAT townhouse or payment of $300,000 in exchange for being a loan guarantor for W-CAT.

100.    In order to hide the W-CAT business relationships among Robert Powell, Debra Powell, Moran, PLG, Ciavarella and Conahan from the public, Moran was named as the sole shareholder of W-CAT and was listed as W-CAT's president, secretary and treasurer (using the office address then used by PLG) on the public records of the Pennsylvania Department of State Corporations Bureau.

101.    On or about May 30, 2008, a Luzerne County newspaper exposed the W-CAT business relationships among Robert Powell, Debra Powell, Moran, PLG, Ciavarella and Conahan.

102.    When Mr. Zappala read the story, he called Robert Powell and told Robert Powell that Robert Powell would either buy Mr. Zappala out of PACC, WPACC and MAYS, or Mr. Zappala would buy Robert Powell out of PACC, WPACC and MAYS, but either way they were done.

22

103.    On June 9, 2008, CIS, Robert Powell and Vision Holdings entered into a Purchase

Agreement pursuant to which CIS purchased Visions Holdings' ownership interests in PACC,

WPACC and Southwestern PA Child Care, LLC ("SWPACC") and purchased Robert Powell's

interests in MAYS.

104.    While the Purchase Agreement was being negotiated, Powell took an additional $19,000

from PACC and $75,000 from WPACC.

105.    Later in June 2008, PACC lost its lease with Luzerne County, and $47.85 million rental

income, because of the W-CAT Scheme.

        C.      THE FLORIDA CONDOMINIUM SCHEME

106.    PLG leased the services of PLG's treasurer and chief financial officer, Patrick Owens

("Owens"), to perform bookkeeping services for the following companies: WPACC, PACC,

MAYS, Gladstone, Forty Degrees North, LLC, Fishin' For A Good Time Charters, LLC (owned

by Robert Powell) and Big Kahuna Realty, LLC ("Big Kahuna" owned by Robert Powell and

Moran).

107.    On or around 2004, Robert Powell located and offered to buy a condominium unit in

Jupiter, Florida, for Robert Powell, Ciavarella and Conahan ("Florida Condominium").

108.    In 2004, Robert Powell, Ciavarella and Conahan acquired the Florida Condominium yet

cloaked their Florida Condominium ownership relationship from the public.  To this end: (i) they

first titled the Florida Condominium in the names of Conahan and his wife,  (ii) who next

transferred ownership of the Florida Condominium to Pinnacle, which was then owned by

Conahan's wife, and (iii) later ownership of Pinnacle was placed in the names of both Conahan's

wife and Ciavarella's wife.  Robert Powell, who contributed most of the Florida Condominium's

costs in the form of prepaid dock rentals, was listed in the Florida Condominium owners'

association's records as a permanent guest resident of the Florida Condominium to memorialize his ownership right to use the Florida Condominium yet mask his ownership from the public.

109.    Robert Powell informed people that he owned and or paid for the Florida Condominium:

      a.    Robert Powell told one of Robert Powell's friends that Robert Powell bought the Florida Condominium for Ciavarella and Conahan;

      b.    Robert Powell informed another friend that Robert Powell owned the Florida Condominium and that Robert Powell paid for the Florida Condominium.

110.    In or about August, October, November and December 2004, Robert Powell paid for the Florida Condominium by ordering Owens, in Owens' capacity as PLG's CFO, to give Robert Powell unauthorized draws of $590,000 from PACC and WPACC and depositing the $590,000 into Vision Holdings' bank account.

111.    Owens, in Owens' capacity as PLG's CFO and at Robert Powell's command, obtained the $590,000 by moving the money from PACC and WPACC's bank accounts into Vision Holdings' bank accounts and recording them as draws.

112.    In turn, Vision Holdings at the direction of Robert Powell, and Debra Powell (through Robert Powell, whom Debra Powell appointed as her agent-in-fact to operate Vision Holdings) paid to Pinnacle $300,000 by checks and $220,000 by wire transfers of $120,000 on July 13, 2004 and $100,000 on September 23, 2004.

      D.    THE PLG OPERATING COSTS SCHEME

113.    Gladstone (a Pennsylvania limited partnership then controlled by Robert Powell and Mr. Zappala) obtained an option to purchase land in Northeastern Pennsylvania to build a cargo airport ("Cargo Airport Project").

24

114.    From time to time, Robert Powell, in his capacity as PLG's shareholder, director and officer required Owens, in Owens' capacity as PLG's CFO, to transfer money from PACC, WPACC, MAYS, Mr. Zappala and Gladstone under the guise of allocating funds to pay for the Cargo Airport Project when instead the monies were diverted to pay for PLG's litigation costs, payroll and overhead.

115.    In or around 2006, Robert Powell's and PLG's use of funds belonging to PACC, WPACC, MAYS, and Mr. Zappala increased substantially.  PLG had cash flow problems due to the costs PLG was incurring and advancing for class action, mass tort and contingent fee litigation cases.  Robert Powell, in his capacity as PLG's shareholder, director and officer, ordered Owens, in Owen's capacity as PLG's CFO, to move money from PACC, WPACC, MAYS and Mr. Zappala's accounts to other accounts and to record the transfers as "loans" to Robert Powell.

116.    Owens moved in excess of $1.4 million dollars from PACC, WPACC and MAYS's bank accounts into the Vision Holdings' bank account and recorded the transfers as loans, draws, advances or legal fees at Mr. Powell's direction. In turn, Owens moved the funds from Vision Holding's bank account to the Powell Law Group, P.C.'s bank account.

117.    Owens moved about $3.8 million directly to the Powell Law Group, P.C.'s bank from the bank accounts of WPACC, PACC, MAYS and Gladstone as follows:  about $1.725 million from bank account of WPACC; about $1.6 million from the bank account of PACC; about $171,000 from the bank account of Gladstone; and, about $332,000 from the bank account of MAYS.

118.    Robert Powell ordered Owens not to inform Mr. Zappala of the "loans".  Robert Powell told Owens that Robert Powell would take care of notifying Mr. Zappala, but Robert Powell did not do so.

119.    In this manner, Owens transferred $5.2 million to Vision Holdings' bank account or to PLG's bank accounts.

120.    Robert Powell and Mr. Zappala agreed that each would contribute $750,000 toward the cost of engineering services for the Cargo Airport Project.

121.    Robert Powell and PLG took from Mr. Zappala the $750,000 that Robert Powell and Mr. Zappala agreed would be used to pay for engineering services for the Cargo Airport Project and used the $750,000 to pay PLG's litigation costs and overhead.

122.    During that time period, Owens would meet with Robert Powell and Moran. Robert Powell would tell them that PLG required cash and that Moran should bill one of the other companies which had cash for legal services in amounts to satisfy PLG's cash flow needs. On occasion and shortly after meeting with Robert Powell either from an invoice provided by Moran or without one at all, Owens would transfer money from Gladstone's or PACC's bank accounts to PLG's bank account the amount of money that Robert Powell dictated.   At Robert Powell's direction, the following amounts were falsely charged as PLG's legal fees to: (i) PACC $27,872.92; and (ii) Gladstone $120,000.

123.    Owens, in his capacity as PLG's CFO, and at Robert Powell's command, co-mingled the $5.2 million dollars that Robert Powell obtained in unauthorized "loans", with the funds that Robert Powell and PLG had received in the Finder's Fee Schemes, the $750,000 diverted from Mr. Zappala that was intended to pay for Gladstone's Cargo Airport Project; and the $147,872.92 in false legal fees from Gladstone and PACC into PLG's bank accounts.

124.    PLG used the money taken from PACC, WPACC, MAYS, Gladstone and Mr. Zappala to pay PLG's overhead and costs PLG was incurring and advancing for mass tort, class action and contingent fee litigation cases, including the costs of *In Re Avoca Litigation*, a mass

environmental tort action in which Robert Powell and PLG represented residents of Luzerne County against the manufacturer of creosote and spinoffs of the manufacturer.

E.    THE CASH BRIBES SCHEME

125.    In or about 2006 through 2007, Robert Powell, individually, and in his capacities as a shareholder, director and officer of PLG, and for Vision Holdings as a member of Vision Holdings, ordered Owens, in Owens' capacity as PLG's CFO, to structure money transactions in order to avoid making currency transaction reports and enable Robert Powell to make cash payments to Conahan.

126.    Owens, in his capacity as PLG's CFO, transferred money from PACC's and WPACC's bank accounts into Vision Holdings' bank accounts, and from there into PLG's bank account.

127.    Over time, Owens, in his capacity as PLG's CFO and Bernadette Sedor, an accountant for PLG, drafted, signed and cashed twenty (19) checks (nine (9) from PLG's bank account, six (6) from PACC's bank account and four (4) from Robert Powell's bank account) and obtained cash in individual amounts below the currency transaction report threshold amount ($10,000.00), although in the aggregate totaling $143,500, and delivered the $143,500 in cash to Robert Powell or to Robert Powell's office at PLG.

128.    Robert Powell and Moran paid the $143,500 in cash to Conahan in five (5) installments: two (2) installments that Robert Powell delivered from PLG's office to Conahan's tipstaff, and three (3) installments that Moran delivered from PLG's office to Conahan.

129.    Moran knew that Robert Powell was gathering large amounts to cash and delivering it to Conahan.

a.      Owens, in his capacity as PLG's CFO informed Moran that Robert Powell was gathering large amounts of cash and borrowing large amount from PACC, WPACC, MAYS and Gladstone, but Moran ignored this information;

b.      In order to make the payments, on five (5) occasions, Robert Powell, while at PLG's office, put large quantities of cash into FedEx boxes. On at least one of those occasions, Moran, while at PLG's office, observed Robert Powell putting the cash into a FedEx box and delivered the FedEx box to Conahan.

F.      CORRUPT INFLUENCE ON THE LUZERNE COUNTY, PENNSYLVANIA, CIVIL JUSTICE SYSTEM

130.    Robert Powell, Moran, and PLG had financial relationships with Judge Ciavarella and Judge Conahan, at the same time that Robert Powell, Moran and PLG represented clients in civil actions before Judge Ciavarella and Judge Conahan.

131.    None of Robert Powell, Moran, PLG, Ciavarella or Conahan disclosed the financial relationships.

132.    In one case, neither Robert Powell nor Judge Ciavarella disclosed their business relationships even though the Defendant's counsel in open court specifically asked about any relationships between Robert Powell and Judge Ciavarella, who was presiding over the case.  In fact, Judge Ciavarella denied any but a casual social relationship with Robert Powell, similar to the casual relationships that Judge Ciavarella had with many Luzerne County attorneys. Ultimately, the jury rendered a verdict in excess of $3 million for PLG's client in that case.

133.    Later, Ciavarella admitted under oath that he was a corrupt judge.

134.     The *In Re Avoca Litigation,* is a mass environmental tort action in which Robert Powell, Moran and PLG represented thousands of persons who lived or worked in or around Avoca,

28

Luzerne County, Pennsylvania as plaintiffs against the manufacturer of creosote who operated a plant in Avoca, as well as spinoffs of the manufacturer, was certainly the most lucrative case in which Robert Powell, Moran or PLG ever participated.

135.    Robert Powell promised the Luzerne County Court Administrator: (i) a "ghost" job with PACC; (ii) to give a contract to clean the PACC Facility to a company owned by the Court Administrator's son; and (iii) to arrange for a contract for the Court Administrator's son's company to clean the Luzerne County Courthouse.

136.    Robert Powell's promises were contingent on the Court Administrator assigning *In Re Avoca Litigation* to either Judge Peter Paul Olszewski (whom Robert Powell preferred), or to Judge John Toole.

137.    The Court Administrator assigned *In Re: Avoca Litigation* to Judge Olszewski.

138.    Judge Olszewski denied the defendants' motion for summary judgment that would have ended *In Re Avoca Litigation*.

139.    Judge Olszewski entered orders referring some of the *In Re Avoca Litigation* claims to arbitration.

140.    Judge Olszewski entered orders confirming arbitration awards for some *In Re Avoca Litigation* plaintiffs.

141.    After Judge Olszewski entered the orders confirming the arbitration awards, some or all of the defendants in the *In Re Avoca Litigation* filed for Bankruptcy protection (the "Bankruptcy Case").

142.    As a result of a plan of reorganization and/or settlement in the Bankruptcy Case, there was established the Tronox Incorporated Tort Claims Trust which has received or will receive

settlements, totaling in aggregate approximately $5 billion for this purpose of settling various tort claims ("Tort Claims Trust").

143.    Approximately $500 million of the Tort Claims Trust fund is designated for the *In Re Avoca* plaintiffs.

144.    PLG is to receive approximately $150 million to $200 million in contingent fees from the Tort Claims Trust for the *In Re Avoca Litigation* ("Avoca Fees").

145.    Robert Powell had a room in his law office building above PLG's offices in which he maintained a bar, complete with alcoholic beverages and tables ("Powell's Private Bar").

146.    Judge Olszewski, Judge Toole, Judge Conahan, Judge Conahan's tipstaff and the Court Administrator frequently drank together with Robert Powell at Powell's Private Bar.

147.    In or about 2005, Judge Olszewski accompanied Judge Conahan and a known drug dealer on a trip to the Florida Condominium.

148.    Judge Olszewski, Judge Conahan and the known drug dealer flew to Florida in a private plane, paid for by Robert Powell.

149.    A portion of the cash payments in the Cash Bribes Scheme were made for the purpose of sharing with Conahan the attorneys' fees obtained by Robert Powell, Moran and PLG in a case that Conahan referred to Robert Powell and PLG.

150.    Robert Powell, Moran and PLG also paid Luzerne County Common Pleas Judge Toole $30,000 as shared attorneys' fees due to a case that Judge Toole's wife referred to Robert Powell and PLG.

151.    Moran, who was Prothonotary of Luzerne County (sometimes "Office of the Prothonotary") and knew that non-disclosure of the payments from Robert Powell and PLG to Judge Conahan, Judge Ciavarella and Judge Toole, the promises to the Court Administrator, the

meeting with Common Pleas judges and administrators in Powell's Private Bar located above PLG's offices in a building owned in part by Moran through Big Kahuna, and Robert Powell's social relationships with all of them irredeemably tainted all of Robert Powell's, Moran's and PLG's judicial proceedings before those judges. Nevertheless, Moran entered of record in the Office of the Prothonotary of Luzerne County, orders, decrees, verdicts and judgments against opponents of Robert Powell, Moran and PLG's clients in the tainted proceedings.

152.    At some point, a federal grand jury began investigating the foregoing crimes, and subpoenaed Robert Powell to testify before the grand jury.

153.    Ultimately, Robert Powell pled guilty to federal charges of:

     a.    misprision of felony for (i) having knowledge of honest service wire fraud relating to bribery and kickbacks, cooperating in the creation of false records to hide, disguise and mis-characterize income that Ciavarella and Conahan received, and (ii) transferring the cash from the Cash Bribes Scheme to Conahan with the intent that the cash not be traceable as income, and did not so inform proper authorities; and,

     b.    being an accessory after the fact to Ciavarella and Conahan's conspiracy to file false income tax returns.

## II.    PARTIES

154.    Plaintiff, PACC, is a Pennsylvania limited liability company, with its sole member's registered place of business in this District.

155.    Plaintiff, WPACC, is a Pennsylvania limited liability company, has its principal place of business in this District and its sole member's registered office is in this District.

156.    Plaintiff, MAYS, is a Pennsylvania corporation with its registered place of business in this District and one of its two places of business is in this District.

157.   Plaintiff, CIS, is a Pennsylvania corporation with its registered place of business in this District.

158.   Plaintiff, Gladstone, is a Pennsylvania limited partnership with its registered place of business in this District.

159.   Plaintiff, Mr. Zappala, is an individual who at all times relevant resided in Pennsylvania.

160.   Defendant, Robert Powell, at relevant times was an attorney licensed to practice law in Pennsylvania; resided in Pennsylvania; now resides in Florida; was the majority shareholder of PLG; was the president and director of PLG; held options to purchase shares of MAYS; was and is a member of Defendant, Vision Holdings, and was Debra Powell's agent-in-fact to operate Vision Holdings, and acted in all those capacities.

161.   Defendant, Debra Powell, at relevant times resided in Pennsylvania; currently resides in Florida; was and is a member of Defendant, Vision Holdings, and operated Vision Holdings through Robert Powell, whom she appointed as her agent-in-fact by a power of attorney.

162.   Defendant, PLG, is a Pennsylvania professional corporation, with its principal place of business in Luzerne County, Pennsylvania.

163.   Defendant, Moran was at relevant times the Prothonotary of Luzerne County, Pennsylvania; is an attorney licensed to practice law in the Commonwealth of Pennsylvania; is a shareholder, director and officer of  PLG; acted in all those capacities; was the sole shareholder, officer and director of W-CAT, and resides in Luzerne County, Pennsylvania.

164.   Defendant, Vision Holdings, is a Pennsylvania limited liability company with its principal place of business at 789 Airport Road, Hazel Township, Pennsylvania, and at relevant times was a member of WPACC and PACC. Upon information and belief, the members of Vision Holdings reside in Florida.

165.    Defendant Jane Sebelin is an attorney registered to practice law in Pennsylvania and is vice-president of Defendant Sebelin Law Offices, a professional corporation with its registered address and principal place of business in Lehighton, Carbon County, Pennsylvania. Upon information and belief, Jane Sebelin and/or Sebelin Law Offices may have a claim upon the Avoca Fees.

166.    Defendant Lang is an attorney licensed to practice law in Pennsylvania whose last known business address was in Luzerne County, Pennsylvania. Lang was a member of the Tort Claims Trust Advisory Committee, and, based upon this information, Plaintiffs believe that Lang may have a claim upon the Avoca Fees.

167.    Matthew Slocum is an attorney licensed to practice law in Pennsylvania. Upon information and belief, Matthew Slocum is a shareholder, director or officer of The Slocum Firm, which is a professional corporation with its registered office and principal place of business in Lackawanna County Pennsylvania. In a Bankruptcy Case filing on April 30, 2014, Matthew Slocum was listed as a member of the Tort Claims Trust Advisory Committee, and, based upon this information, Plaintiffs believe that Matthew Slocum and or The Slocum Firm may have a claim against the Avoca Fees.

### III.    JURISDICTION AND VENUE

168.    This Court has jurisdiction over the following claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to 18 USC § 1964(a) and 28 USC § 1331.  This Court has supplemental jurisdiction over the following state law claims under 28 USC § 1367(a) because they are so related to the following RICO claims that they form part of the same case and controversy under Article III of the United States Constitution. This Court also has jurisdiction over the claims in Counts 11, 17 and 18of this Complaint pursuant to 28 U.S.C.

1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

169.    Venue lies in this District under 18 USC §1965(a), and 28 USC § 1391(b)(1) and 28 USC § 1391(b)(2) because a substantial amount of the acts or omissions which give rise to the following claims occurred in this District, including, but not necessarily limited to, deposits into and receipts from the United States mail and commercial couriers, making and receiving interstate wire communications, making and receiving interstate wire transfers, executions of loan documents, loan closings, and S&T Bank, which Defendants also victimized, resides in this District.

IV.    RICO ENTERPRISES

A.    THE   ASSOCIATION-IN-FACT ENTERPRISE

170.    Robert Powell, Moran, PLG, Vision Holdings, Robert Mericle, Mericle Construction, Ciavarella, Conahan, the Court of Common Pleas of Luzerne County, the Office of the Prothonotary of Luzerne County, Beverage Marketing and Pinnacle  were an association-in-fact formed to fix civil cases in the Court of Common Pleas of Luzerne County, Pennsylvania ("Association").

1.    ROLES OF MEMBERS OF THE ASSOCIATION

171.    Robert Powell was founder, chief executive officer, confidence man, financer, administrator, briber, money launderer, courier and beneficiary of the Association and had Debra Powell's power of attorney to operate Vision Holdings as her agent-in-fact.

172.    Vision Holdings was a money launderer, briber and beneficiary of the Association.

173.   Moran was a briber, money launderer, courier and beneficiary of the Association and as Prothonotary of Luzerne County entered orders, decrees, verdicts and judgments which benefited members of the Association.

174.   PLG was a money launderer, briber and beneficiary of the Association.

175.   Robert Mericle was a financier, money launderer, briber and beneficiary the Association.

176.   Mericle Construction was a financier, money launderer, briber and beneficiary of the Association.

177.   Judge Ciavarella, Judge Conahan and the Luzerne County Court of Common Pleas implemented the Association's schemes and influenced and/or predetermined the outcome and/or entered decisions and orders, decrees, judgments and verdicts in cases before them in which Robert Powell and PLG represented litigants and in which Robert Mericle and/or Mericle Construction and/or other entities in which Robert Mericle had ownership interests were litigants.

178.   Beverage Marketing was a money launderer and front for the Association.

179.   Pinnacle was a money launderer and front for the Association.

    2.  THE ASSOCIATION AFFECTED INTERSTATE COMMERCE

180.   The Association affected interstate commerce or foreign commerce in the following ways:

    a.  Robert Powell, individually and in his capacity as shareholder, director and president of  PLG, Moran, individually and in her capacity as shareholder, director and officer of PLG, along with PLG affected interstate business by, among other things: filing in the Office of the Prothonotary pleadings, praecipes for judgment and other legal documents against parties that resided and did business outside of Pennsylvania; negotiating settlements with and obtaining

settlement amounts from parties and insurance companies that resided and did business outside of Pennsylvania; contracting with companies that resided outside of Pennsylvania for electronic legal research services; using the electronic legal research services; purchasing supplies in interstate commerce; using the services of banks, particularly wire transfer services, in interstate commerce; using the United States mail and commercial carrier services for interstate deliveries of mail; contracting with a telecommunications provider or providers for telephone and computer service; using the telephone to make interstate business calls and using computers to send interstate e-mails.

      b.     Robert Powell was the sole member of Fishin' For A Good Time Charters, LLC ("Fishin'"), a Rhode Island limited liability company. Robert Powell owned and operated in Florida and Costa Rica a boat named "Reel Justice". Robert Powell was the sole shareholder of Vision Holdings, Inc., a Cayman Islands corporation which he used to hide assets from his wife in Pennsylvania. Robert Powell was the undisclosed owner of the Florida Condominium. (The purpose for the non-disclosure was to hide his ownership from his wife).

      c.     Moran, individually and in her capacity as Prothonotary of Luzerne County Pennsylvania, and the Office of the Prothonotary of Luzerne County, affected interstate commerce by entering orders and judgments for and against parties residing outside of Pennsylvania; transferring judgments to courts outside of Pennsylvania; certifying records for use outside of Pennsylvania; accepting from and entering of record pleadings, motions, petitions and other legal documents of parties outside of Pennsylvania; purchasing supplies in interstate commerce; using the services of banks, particularly wire transfer services, in interstate commerce; using the United States mail and commercial courier services for interstate deliveries of mail; contracting with a telecommunications provider or providers for telephone and computer

service; using the telephone to make interstate business calls and using computers to send interstate e-mails.

  d.  Ciavarella and Conahan, individually and as judges of the Court of Common Pleas of Luzerne County, and the Court of Common Pleas of Luzerne County, Pennsylvania, affected interstate commerce by, among other things: presiding over and deciding cases brought by and against parties from outside of Pennsylvania; entering judgments and mediating settlements that were paid for by parties and insurance companies from outside Pennsylvania; contracting with companies that resided outside of Pennsylvania for electronic legal research services; using the electronic legal research services; purchasing supplies in interstate commerce; using the services of banks, particularly wire transfer services, in interstate commerce; using the United States mail and commercial carrier services for interstate deliveries of mail; contracting with a telecommunications provider or providers for telephone and computer service; using the telephone to make interstate business calls and using computers to send interstate e-mails. Ciavarella and Conahan were the owners of the Florida Condominium. At the time that they purchased the Florida Condominium it was a shell, and they purchased supplies, equipment and labor in interstate commerce to finish construction and furnish the Florida Condominium.

  e.  Robert Powell, individually and in his capacity as a member of Vision Holdings, Debra Powell, individually and in her capacity as member of Vision Holdings (by and through her agent-in-fact, Robert Powell, to whom she gave power of attorney over her interests in Vision Holdings), and Vision Holdings, affected interstate commerce by, among other things: purchasing supplies in interstate commerce; using the services of banks, particularly wire transfer services, in interstate commerce; using the United States mail and commercial carriers to make interstate deliveries; contracting with a telecommunications provider or providers for

telephone and computer service; using the telephone to make interstate business calls and using computers to send interstate e-mails.

f.      Robert Mericle and Mericle Construction affected interstate commerce. The web page of Mericle Commercial Real Estate Services states that, Mericle Construction is the in house construction division of Mericle Commercial Real Estate Services, which is one of the largest commercial/industrial developers in the Commonwealth of Pennsylvania; Mericle Construction is the authorized builder in Northeast Pennsylvania for the Butler Manufacturing Company (a building-solutions company providing the design, manufacture, and marketing of metal building systems for commercial construction, with its principal place of business in Kansas City, Missouri), from which Mericle Construction purchases goods to be used in construction and has received awards as "Million Dollar Builder," "High Performance Builder," and "#1 Volume Builder of the Year"; Mericle Construction obtains performance bonds and payment bonds from Travelers Casualty and Surety Company of America which has its principal place of business in Hartford, Connecticut; Mericle Construction employs approximately 200 people; on February 9, 2011, in the United States District Court for the Middle District of Pennsylvania ("Middle District") Robert Mericle, the president of Mericle Construction, testified under oath that Mericle Construction purchases "an awful lot" of material and equipment from other states for use in its business, and that it customers come from all states and all over the world.

g.      Beverage Marketing and Pinnacle caused their respective banks to receive and to send interstate wire transfers from and to other banks.

B.      OTHER ENTERPRISES THAT AFFECTED INTERSTATE COMMERCE

181.    PLG, Vision Holdings, Mericle Construction, the Office of Prothonotary of Luzerne County, Pennsylvania, and the Court of Common Pleas of Luzerne County, Pennsylvania, Beverage Marketing and Pinnacle are all enterprises that affect interstate commerce as set forth in Paragraph 180, above.

##    C.    PREDICATE ACTS AND PATTERN OF RACKETEERING ACTIVITY

182.    Robert Powell demanded payment of $1.0 million from Robert Mericle and Mericle Construction and accepted $387,600 from Robert Mericle and Mericle Construction in exchange for PACC's entering into the PACC Facility Construction Contract.

183.    Robert Powell, Robert Mericle and Mericle Construction in paying $2.3 million to Ciavarella and Conahan in exchange for favorable rulings from Ciavarella and Conahan in civil cases.

184.    Robert Powell paid $590,000 toward the construction of the Florida Condominium in exchange for favorable rulings from Ciavarella and Conahan in civil cases.

185.    Robert Powell and Moran paid $143,500 cash to Conahan for favorable rulings from Ciavarella and Conahan in civil cases and for Conahan's influence over the Court as President Judge.

186.    Robert Powell and Moran promised Conahan, Ciavarella and their wives either a townhouse or $300,000 for favorable rulings from Ciavarella and Conahan in civil cases.

187.    Robert Powell promised the Court Administrator a "ghost" job with PACC; to give a contract to clean the PACC Facility to a company owned by Court Administrator's son, and to arrange for a contract to clean the Luzerne County Courthouse for the Court Administrator's son's company in exchange for the Court Administrator's assigning *In Re Avoca Litigation* to

either Judge Peter Paul Olszewski (whom Robert Powell preferred) or to Judge John Toole and the case was assigned to Judge Olszewski.

188.    Robert Powell and Debra Powell, individually and on behalf of and Vision Holdings, attended and participated in loan closings that occurred in Pittsburgh, Pennsylvania, in this District, and signed and submitted to S&T Bank loan closing documents Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings) and Vision Holdings, signed and delivered to S&T Bank by United States Mail or commercial carrier, signed loan closing documents that induced S&T Bank, headquartered in this District, to lend the $28,590,000 (which included Total False Charges to PACC and WPACC of $2,677,853 comprised of: fraudulent Total Finder's Fees of $2,297,600, Total Unearned and Unnecessary Overhead of $252,736,  and Fictional Profits of $127,517) to PACC and WPACC.

189.    Robert Mericle and Mericle Construction and Robert Powell (on behalf of Debra Powell and Vision Holdings) drafted the falsely inflated construction costs estimates and caused them to be submitted them to PACC and WPACC by United States mail or commercial carrier, and sent false IRS Form 1099s for the finder's fees by United States mail.

190.    Robert Mericle and Mericle Construction and Robert Powell (on behalf of himself, Debra Powell and  Vision Holdings) drafted, signed and caused to be submitted to S&T Bank by United States mail, commercial carrier or wire the falsely inflated construction contracts that induced S&T Bank to lend the $28,590,000 to PACC and WPACC.

191.    Robert Powell, on his own behalf and on behalf of Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), Vision Holdings, PLG, Robert Mericle and Mericle Construction made or caused to be made interstate wire transfers, faxes and

commercial carrier deliveries of some or all the proceeds of the four part Finder's Fee Scheme, the Registration and Commission Agreements and Final Acceptance Letters related to the Finder's Fee Scheme.

192.    Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), Vision Holdings, and PLG, made or caused to be made by United States mail or commercial carrier deliveries and interstate wire transfers of some or all of the $590,000 to Pinnacle, Ciavarella and Conahan as part of the Florida Condominium Scheme

193.    Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings) Vision Holdings, and PLG, made or caused to be made the structured transactions to obtain $143,500 cash to pay Conahan.

194.    Robert Powell, on behalf of himself, Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings) and Vision Holdings, Moran, and PLG, paid $143,500 in cash to Conahan.

195.    Robert Powell, for himself and Debra Powell who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings) Vision Holdings, PLG, Moran, Robert Mericle, and Mericle Construction, made or caused to be made by United States mail or commercial carrier deliveries and interstate wire transmissions in order to file documents in the Office of the Prothonotary of the Luzerne County and to serve those documents upon the Luzerne County Court of Common Pleas, particularly, Ciavarella and Conahan serving as judges in cases in which the business relationships among the Defendants were concealed.

196.    Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings) Vision Holdings, PLG, Moran, Robert Mericle,

and Mericle Construction, made or caused to be made by United States mail or commercial carrier deliveries and interstate wire transmissions to receive in and to send from the Office of the Prothonotary of the Luzerne County documents to Ciavarella and Conahan and parties in cases in which the business relationships among the Defendants were not disclosed.

197.    Beginning in approximately March 2002, and continuing until approximately August 2008, Mericle Construction, with Robert Powell's, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), PLG's, Vision Holdings', and Robert Mericle's knowledge and consent, submitted by the United States mail, commercial carrier or wire to Highland Engineers (the engineers for all of the PACC Facility and WPACC Facility construction and additions), to PACC and WPACC, to Robert Powell at PLG, to Mr. Zappala, and to S&T Bank numerous fraudulently inflated applications for draws upon the PACC and WPACC loans from S&T in order to induce PACC and WPACC to pay the costs of PACC Facility and WPACC Facility construction contracts and their Addition construction contracts ("Fraudulent Loan Draw Applications").

198.    The submissions regarding the construction of the WPACC Facility and Addition to the WPACC Facility originated from Butler County, Pennsylvania, in this District.

199.    Beginning in approximately March 2002, and continuing until approximately August 2008, Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), Vision Holdings, PLG, Robert Mericle, and Mericle Construction, knew or should have known, that Mr. Zappala would approve and Highland Engineers, PACC and WPACC would submit, and, in fact, caused or knowingly permitted Highland Engineers and PACC and WPACC to submit by United States mail, commercial carrier or fax numerous Fraudulent Loan Draw Applications to S&T Bank in this

42

District in order to cause S&T Bank to release the PACC and WPACC Facility construction loan and Addition construction loan proceeds in order that PACC and WPACC could pay the Fraudulent Loan Draw Applications.

200.    Beginning in approximately March 2002, and continuing until approximately August 2008, S&T Bank in reliance on the numerous Fraudulent Loan Draw Applications, processed such Fraudulent Loan Draw Applications in this District and released from this District on behalf of PACC and WPACC proceeds of the PACC and WPACC Facility construction loans and Addition construction loans, so that PACC and WPACC could pay the numerous Fraudulent Loan Draw Applications.

201.    Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), Vision Holdings, PLG, Robert Mericle, and Mericle Construction, knew or should have known that S&T Bank would process in and release from this District and, in fact, caused or knowingly permitted S&T Bank to process and release from this District, loan proceeds on behalf of PACC and WPACC Facility construction loans and Addition construction loans in order that PACC and WPACC could pay the numerous Fraudulent Loan Draw Applications .

202.    Beginning in approximately March 2002, and continuing until approximately August 2008, Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), Vision Holdings, PLG, Robert Mericle, and Mericle Construction, knew or should have known that S&T Bank would wire transfer funds, and, in fact, caused or knowingly permitted S&T Bank to wire transfer funds in order to pay the Fraudulent Loan Draw Applications.

203.    Beginning in approximately the Spring of 2002, and continuing until approximately August 2008, Robert Mericle and Mericle Construction, with Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings) Vision Holdings, and with PLG's knowledge and consent, caused or knowingly permitted Mericle Construction to take wire transfers of funds from S&T Bank to pay numerous Fraudulent Loan Draw Applications.

204.    Beginning in about June 2003, and continuing until the date of this Complaint and beyond, Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), Vision Holdings, PLG, Robert Mericle, and Mericle Construction, knew or should have known that S&T Bank would send, and, in fact, caused and knowingly permitted S&T Bank to process in this District and send from this District each month to PACC and WPACC by United States mail, commercial carrier or wire, statements requiring installment or partial repayment of the fraudulently inflated PACC and WPACC Facility construction loans and Addition construction loans.

205.    Beginning about June 2003, and continuing until the date of this Complaint and beyond, each month, Robert Powell, on behalf of Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), Vision Holdings, PLG, Robert Mericle, and Mericle Construction, knew or should have known, and, in fact, caused  PACC and WPACC to transfer funds by United States mail, commercial carrier or wire from  PACC and WPACC to S&T Bank in this District in order to pay the fraudulently inflated PACC and WPACC Facility construction loans and Addition construction loans .

206.    Robert Powell, on behalf of himself, Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), and Vision Holdings caused the Purchase Agreement to be sent by wire.

207.    Robert Powell, Debra Powell, Robert Mericle, Mericle Construction, Vision Holdings, Moran, PLG,  Ciavarella, Conahan, Beverage Marketing, and Pinnacle's activities set forth above were in violation of 18 USC §§ 1341, 1343, 1344, 1956, 1957 and 2314, 18 Pa. C.S. § 4108 and 18 Pa. C.S. § 4701, are racketeering activity within the meaning of 18 USC § 1961(1), and the Currency and Foreign Transactions Reporting Act, and constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

208.    After Robert Powell received subpoenas to testify before a federal grand jury, and after Robert Powell, Ciavarella and Conahan believed that Ciavarella and Conahan were the targets of a federal grand jury investigation, Ciavarella asked Robert Powell for additional bribes.

209.    PACC and WPACC considered building a juvenile detention or treatment in Bergen County New Jersey, and Robert Powell and Robert Mericle planned to pay Ciavarella and Conahan a finder's fee for the construction of that facility.

210.    The pattern of racketeering activity described above began in 2001, continues to date and will continue until all of the PACC and WPACC Facility construction loans and Addition construction loans from S&T Bank are paid in full.

211.    The pattern of racketeering activity was ongoing, and threatened to be ongoing until the Bergen County, New Jersey facility was built, and PACC and WPACC Facility construction loans and Addition construction loans from S&T Bank are paid in full.

D.    STATUTE OF LIMITATIONS

45

212.    Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), Vision Holdings, PLG, Robert Mericle, and Mericle Construction fraudulently prevented Plaintiffs from discovering that the finder's fees were included in the PACC and WPACC construction estimates, construction contracts and loans in that, among other things:

a.      Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), Vision Holdings, PLG, Robert Mericle, and Mericle Construction, knew of and did not disclose, or consented to, the submission of falsely inflated construction costs listed in estimates and contracts that did not disclose the enormous Total Finder's Fees of $2,297,600, Total Unearned and Unnecessary Overhead of $252,736, Fictional Profits of $127,517, or their sum of $2,677,853 representing Total False Charges to PACC and WPACC padded into and omitted from disclosure in line items in construction estimates and construction contracts' costs lists.

b.      In or around late 2007 or early 2008 Robert Powell ordered PACC and WPACC's independent auditors not to perform audits for 2007.

c.      On or about June 9, 2008, CIS, Robert Powell and Vision Holdings entered into a Purchase Agreement.

d.      The Purchase Agreement in final form, signed by Robert Powell individually and on behalf of Debra Powell and Vision Holdings contains the following representation and warranty:

(m)     With respect to the financial statements for the PACC Entities dated as of December 31, 2007 and April 30, 2008 (the "Financial Statements"), which have been delivered to Buyer, neither RJP nor Seller [Vision Holdings], to the best of his or its knowledge and belief, knows of any matter, transaction, liability,

46

obligation, default or event that has materially and adversely affected, or is
reasonably likely to materially and adversely affect:  (i) the results of operations
or financial condition of any of the PACC Entities as presented in any of such
Financial Statements, or (ii) the financial condition of the PACC Entities as of the
date hereof.

e.     At the time that Robert Powell signed the Purchase Agreement in its final form,

he knew that the forgoing representation and warranty was materially false for the reasons set

forth above.

f.     Drafts of the Purchase Agreements and the Gladstone Purchase Agreement were

exchanged among CIS' attorney and the attorney for Powell and Vision Holdings by e-mail

and/or fax.

g.     On July 30, 2008, during a conversation that Robert Powell knew was being

recorded by agents of the United States ("July 30, 2008 Judges' Taped Conversation"), Robert

Powell falsely stated that the Finder's Fee Scheme was Robert Mericle's idea; Robert Powell did

not correct Ciavarella's erroneous statement that (i) Robert Mericle paid the finder's fees from

profits, (ii) Robert Mericle did not inflate the project, and (iii) nothing came out of Greg

Zappala's pockets. Robert Powell also failed to correct Conahan's statement that "nobody fucked

Greg Zappala on this deal."

h.     in the Middle District Litigation, Robert Powell refused to be deposed based upon

his Fifth Amendment right not to incriminate himself, until June 2013 after he was released from

prison.

i.     on July 1, 2009, at his plea colloquy in the Middle District, Robert Powell did not

correct the statement of the United States Attorney that as to Robert Powell, there was no

finder's fee.

j.      In February 2011, at Ciavarella's criminal trial, Robert Powell falsely testified that:

i.      Robert Mericle lied when Robert Mericle told the grand jury that Robert Powell had orchestrated all the payments;

ii.     Robert Mericle lied when Robert Mericle told the grand jury that the payments were Robert Powell's idea;

iii.    Robert Mericle started it;

iv.     Robert Mericle orchestrated the payments;

v.      Robert Mericle set the whole thing up; and,

vi.     it was Robert Mericle's idea.

k.      In February 2011, at Ciavarella's criminal trial, Robert Powell laid the foundation for the admission of a transcript of the July 30, 2008 Judges' Taped Conversation and thereby compounded the lies set forth in subparagraph j. above.

l.      Robert Powell, individually and in his capacity as agent-in-fact for Debra Powell, member of Vision Holdings, and President of PLG, and Vision Holdings failed to disclose that money was fraudulently transferred from MAYS, PACC or WPACC to Vision Holdings and PLG in order to fund litigation carried on by PLG, and Plaintiffs did not learn of the transfer or that the money was used to fund litigation for PLG in the Court of Common Pleas of Luzerne County until sometime in late 2011 or early 2012.

m.      Robert Powell, on behalf of himself and Debra Powell (who had appointed Robert Powell as her agent-in-fact to operate Vision Holdings), Vision Holdings and PLG, directed Owens to transfer (and not to disclose the transfer of) the moneys from MAYS, PACC or

WPACC to Vision Holdings and PLG in order to fund costs PLG was incurring and advancing for mass tort, class action and contingent fee litigation cases.

213.    Plaintiffs could not know and did not learn that that about $2.3 million in finder's fees were falsely built into PACC and WPACC construction contracts and loans until September 10, 2010, when Plaintiffs' attorney overheard Robert Mericle's and Mericle Construction's attorney so inform another attorney.

214.    Plaintiffs could not know and did not learn that about $2.3 million in finder's fees were built into PACC and WPACC construction contracts and loans at Robert Powell's command until February 9, 2011, when Robert Mericle so testified during Ciavarella's criminal trial.

215.    Prior to Ciavarella's criminal trial in 2011, the United States Attorney summarized its case against Ciavarella as "Kids-for-Cash", a conspiracy to place juveniles in the PACC and WPACC facilities in return for the finder's fees and Robert Powell's payments, emphasizing that it was the worst judicial scandal in the history of the United States.

216.    On February 18, 2011, the jury in Ciavarella's criminal trial rejected the "Kids-for-Cash" theory with an acquittal, and convicted Ciavarella of other offenses.

217.    Plaintiffs could not know, and did not know, that the jury in Ciavarella's criminal trial found that Robert Powell, Vision Holdings, PLG, Moran, Robert Mericle and Mericle Construction were actually paying Ciavarella and Conahan for favorable rulings in civil actions in Luzerne County Court of Common Pleas, until the United States Court of Appeals so found on May 24, 2013 (see, *United States v. Ciavarella,* 716 F.3d 705, 727-731 (3d Cir. 2013)) and the Solicitor General confirmed same in February 2014 in its brief filed in the Unites States Supreme Court in opposition to Ciavarella's petition for a writ of certiorari.

      E.     INJURIES IN BUSINESS OR PROPERTY

218.    WPACC, located in this District, has suffered injuries and will suffer injuries to its businesses and property by reason of Defendants' activities set forth above in that it:

a.    borrowed and paid, and will continue to pay, the principal amount of $16.4 million in loans from S&T Bank, in this District, to construct and add to the WPACC Facility that it would not have otherwise borrowed or paid, and paid approximately $5.4 million in interest, and will continue to pay interest, on the money that they would not have otherwise borrowed;

b.    borrowed and paid, and will continue to pay, $1.150 million in loan principal for fraudulent finder's fees built into the WPACC Facility construction contract and WPACC Addition construction contract, which is more than the principal amount necessary to construct and add to the WPACC Facility, and paid approximately $432,000, and will continue to pay interest on the money that they would not have borrowed otherwise;

c.    borrowed and paid, and will continue to pay, $116,500 in loan principal for Mericle Construction's Unearned and Unnecessary Overhead on the WPACC Facility construction contract and WPACC Addition construction contract, which is more than it otherwise would have borrowed or paid, and paid approximately $58,000 in interest, and will continue to pay interest, on the money that they would not have borrowed otherwise;

d.    borrowed and paid, and will continue to pay, $57,500 in principal for Mericle Construction's Fictional Profits on the WPACC Facility construction contract and WPACC Addition construction contract, which is more than it otherwise would have borrowed or paid, and paid $20,000 and will continue to pay interest on the money that they would not have borrowed otherwise;

50

      e.      lost money that was paid to Ciavarella and Conahan as finder's fees,

condominium payments or cash, the amounts of which are to be proven more specifically at trial;

      f.      incurred costs, including attorneys' fees, in the amount of approximately

$379,000 to defend, has paid $300,000 and will pay $950,000 more to settle the civil actions

brought against WPACC as a result of Defendants' actions (other costs have been billed but not

paid as of the date of filling this complaint, and other costs have not been billed as of the date of

filing of this complaint);

      g.      lost interest on the preceding amounts.

219.    PACC has suffered injuries and will suffer injuries to it business and property by reason

of Defendants' activities set forth above in that it:

      a.      borrowed and paid, and will continue to pay, the principal amount of $11.4

million to in loan principal from S&T Bank in this District to construct the PACC Facility and

PACC Addition that it would not have otherwise borrowed or paid, and paid approximately $5.1

million in interest and will continue to pay interest on the money that it would not have

otherwise borrowed;

      b.      borrowed and paid, and will continue to pay, $1,147,600 in loan principal for

fraudulent finder's fees built into the PACC Facility construction contract and PACC Addition

construction contract, which is more than the principal amount necessary to construct the PACC

Facility and the PACC Addition, and paid approximately $469,000 in interest, and will continue

to pay interest on the money that they would not have borrowed otherwise;

      c.      borrowed and paid, and will continue to pay, $116,500.00 in loan principal for

Mericle Construction's Unearned and Unnecessary Overhead on the PACC Facility construction

contract and PACC Facility Addition contract, which is more than it otherwise would have

borrowed or paid, and paid $46,000 in interest and will continue to pay interest on the money

that it would not have borrowed otherwise;

      d.      borrowed and paid, and will continue to pay, $57,500 more profit on the PACC

Facility construction contract and PACC Addition construction contract than it otherwise would

have paid, and paid approximately $23,000 in interest and will continue to pay interest on the

money that it would not have borrowed;

      e.      lost $47.85 million in rental income under the Lease with Luzerne County;

      f.      lost money that was paid to Ciavarella and Conahan as finder's fees,

condominium payments and cash, and the costs of Robert Powell and PLG's litigation before

Ciavarella and Conahan, the amounts of which are to be proven more specifically at trial;

      g.      incurred costs, including attorneys' fees in the amount of approximately $.1.96

million to defend, paid $300,000 and will pay $950,000 more to settle the civil actions brought

against PACC as a result of Defendants' actions (other costs have been billed but not paid as of

the date of filling this complaint, and other costs have not been billed as of the date of filing of

this complaint);

      h.      lost $27,872.92 that it paid to PLG for services that PLG did not render and costs

that PLG did not incur.

      i.      lost interest on the preceding amounts.

220.    MAYS has suffered injuries and harm to its business and property by reason of

Defendants' activities set forth above in that it lost:

      a.      the money that was paid to Ciavarella and Conahan as finder's fees, condominium

payments and cash;

      b.      the payments from Luzerne County under the  MAYS management agreement;

c.      the costs of Robert Powell and PLG's litigation before Judges Ciavarella and Conahan, the amounts of which are to be proved more specifically at trial;

d.      incurred costs, including attorneys' fees in the amount of approximately$880,000 to defend the civil actions brought against PACC as a result of Defendants' actions (other costs have been billed but not paid as of the date of filling this complaint, and other costs have not been billed as of the date of filing of this complaint);

e.      lost interest on the preceding amounts.

221.   CIS has suffered injuries and harm to its business and property by reason of Defendants' activities set forth above in that it lost profits in the amount of half of the amounts that were paid to Ciavarella and Conahan as finder's fees and the interest thereon, condominium payments and cash, and the costs of Robert Powell and PLG's litigation before Judges Ciavarella and Conahan, plus lost interest on the preceding amounts, the amounts of which are to be proven more specifically at trial.

222.   Gladstone suffered injuries and harm to its business and property by reason of Defendants' activities set forth above in that it lost $750,000 that was to be paid for engineering service, $120,000 that it paid to PLG for services that PLG did not render and costs that PLG did not incur, and lost $171,000 that PLG, Robert Powell and Moran took from its bank account to pay for PLG's operating costs and litigation costs plus interest on the preceding amounts, in an amount to be proven more specifically at trial.

223.   Mr. Zappala suffered injuries and harm to his business and property by reason of Defendants' activities set forth above in that he:

a.      lost income in the amount of one half of the amounts that were paid to the Ciavarella and Conahan as finder's fees and the interest thereon, condominium payments and

cash and the costs of Robert Powell and PLG's litigation before Ciavarella and Conahan, the amounts of which are to be proven more specifically at trial;

b.     lost income from PACC and WPACC in an amount to be proven at trial;

c.     lost the $750,000 for engineering services for the Cargo Airport Project that were diverted to PLG;

d.     guarantied WPACC and PACC construction loans and Addition construction loans of which guaranties, $2 million are still outstanding;

e.     incurred costs, including attorneys' fees in the amount of approximately $14,000 to defend the civil actions brought against him as a result of Defendants' actions;

f.     lost interest on the preceding amounts.

## V.     CLAIMS

### COUNT 1
### 18 U.S.C. § 1964(c)

### PLAINTIFFS v. ROBERT POWELL, MORAN, PLG AND VISION HOLDINGS

224.    The foregoing paragraphs are incorporated herein.

225.    Robert Powell, Moran, Vision Holdings, and PLG operated or participated in the operation of the Association through pattern of racketeering activity as set forth above, in violation of 18 USC § 1962(c).

226.    By reason of Robert Powell, Vision Holdings, PLG's operating or participating in the operation of the Association through pattern of racketeering activity as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Defendants, jointly and/or severally, as follows:

54

a.      awarding the amount of damages set forth above, plus interest;

b.      awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

c.      granting such other relief as this Court deems just.

COUNT 2
18 U.S.C. § 1964(d)
PLAINTIFFS v.
ROBERT POWELL, MORAN, PLG AND VISION HOLDINGS

227.    The foregoing paragraphs are incorporated herein.

228.    Robert Powell, Moran, Vision Holdings and PLG conspired, as set forth above, with each other and with the other members of the Association to operate or to participate in the operation of the Association through pattern of racketeering activity as set forth above, in violation of 18 USC § 1962(d).

229.    By reason of Robert Powell Vision Holdings and PLG's conspiring with each other and with the other members of the Association to operate or to participate in the operation of the Association through pattern of racketeering activity, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Defendants, jointly and/or severally, as follows:

a.      awarding actual damages as set forth above, plus interest;

b.      awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

c.      granting such other relief as this Court deems just.

COUNT 3
18 U.S.C. § 1964(c)

PLAINTIFFS v. ROBERT POWELL, MORAN AND PLG

230.    The foregoing paragraphs are incorporated herein.

231.    Robert Powell, Moran, individually and as agents for PLG, participated in the operation of the Court of Common Pleas of Luzerne County as officers of the Court though a pattern of racketeering activity as set forth above in violation of 18 U.S.C. § 1962(c).

232.    By reason of Robert Powell, Moran and PLG's participating in the operation of the Court of Common Pleas of Luzerne County as officers of the Court through a pattern of racketeering activity as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Robert Powell, Moran and PLG, jointly and/or severally, as follows:

        a.      awarding actual damages as set forth above, plus interest;

        b.      awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

        c.      granting such other relief as this Court deems just.

## COUNT 4
### 18 U.S.C. § 1964(c)
### PLAINTIFFS v.  ROBERT POWELL, MORAN AND PLG

233.    The foregoing paragraphs are incorporated herein.

234.    Ciavarella and Conahan operated the Court of Common Pleas of Luzerne County though a pattern of racketeering activity as set forth above.

235.    Robert Powell, Moran and PLG conspired, as set forth above, with each other and the other members of the Association to participate in the operation of the Court of Common Pleas

56

of Luzerne County as officers of the Court though a pattern of racketeering activity as set forth above in violation of 18 U.S.C § 1962(d).

236.    By reason of the members of the Association's conspiring to participate in the operation of the Court of Common Pleas of Luzerne County as officers of the Court through a pattern of racketeering activity as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Robert Powell, Moran and PLG, jointly and/or severally, as follows:

        a.        awarding actual damages as set forth above, plus interest;

        b.        awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

        c.        granting such other relief as this Court deems just.

COUNT 5
18 U.S.C. § 1964(c)
PLAINTIFFS v. ROBERT POWELL, MORAN AND PLG

237.    The foregoing paragraphs are incorporated herein.

238.    Robert Powell, Moran and PLG participated in the operation of the Office of the Prothonotary of Luzerne County though a pattern of racketeering activity as set forth above in violation of 18 U.S.C § 1962(c).

239.    By reason of Robert Powell, Moran and PLG participating in the operation of the Court of Common Pleas of Luzerne County as officers of the Court through a pattern of racketeering activity as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against

Robert Powell, Moran and PLG, jointly and/or severally, as follows:

a.      awarding actual damages as set forth above, plus interest;

b.      awarding treble the amount of actual damages set forth above, plus interest, and

reasonable costs of this action, including attorneys' fees;

c.      granting such other relief as this Court deems just.

COUNT 6

18 U.S.C. § 1964(a)

PACC, WPACC, MAYS AND MR. ZAPPALA v. ROBERT POWELL, MORAN AND PLG

240.    The foregoing paragraphs are incorporated herein.

241.    Robert Powell, Moran, individually and as agents for PLG used the income that they

derived from a pattern of racketeering activity to acquire an interest in and/or the operation of the

Court of Common Pleas of Luzerne County as officers of the Court though a pattern of

racketeering activity as set forth above in violation of 18 U.S.C § 1962(a).

242.    By reason of Robert Powell, Moran and PLG's use of the money they acquired through

pattern of racketeering activity as set forth above, hundreds of juveniles and their parents sued

PACC, WPACC, MAYS and Mr. Zappala, alleging violations of the juveniles' and parents'

constitutional rights, violations of the Racketeer Influenced and Corrupt Organizations Act, false

imprisonment and civil conspiracy.

243.    By reason of Robert Powell, Moran and PLG's use of the money they acquired through

pattern of racketeering activity as set forth above, PACC, WPACC, MAYS and Mr. Zappala

have been injured in their property or business in that they were required to expend and incur

legal fees and costs defending against and settling the suits of the juveniles and parents in the

amounts set forth above.

WHEREFORE, PACC, WPACC, MAYS and MR. Zappala ask this Honorable Court to enter judgment in their favor and against Robert Powell, Moran and PLG, jointly and/or severally, as follows:

      a.      awarding actual damages as set forth above, plus interest;

      b.      awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

      c.      granting such other relief as this Court deems just.

COUNT 7
18 U.S.C. § 1964(c)
PLAINTIFFS v. MORAN

244.    The foregoing paragraphs are incorporated herein.

245.    Moran operated or participated in the operation of the Office of the Prothonotary of Luzerne County through a pattern of racketeering activity as set forth above.

246.    By reason of the Moran's the Office of the Prothonotary of Luzerne County through pattern of racketeering activity as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Moran, as follows:

      a.      awarding actual damages as set forth above, plus interest;

      b.      awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

      c.      granting such other relief as this Court deems just.

COUNT 8
18 U.S.C. § 1964(c)
PLAINTIFFS v.
ROBERT POWELL, MORAN, PLG, AND VISION HOLDINGS

59

247.    The foregoing paragraphs are incorporated herein.

248.    Robert Powell, Moran, PLG and Vision Holdings conspired, as set forth above, with each other and the other members of the Association to participate in the operation of the Office of the Prothonotary of Luzerne County though a pattern of racketeering activity as set forth above in violation of 18 U.S.C. 1962(d).

249.    By reason of the members of the Association's conspiring to participate in the operation of the Office of the Prothonotary  of Luzerne County through pattern of racketeering activity as set forth above, the Plaintiffs have been injured in their property or business as set forth above. WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Robert Powell, Moran, PLG and Vision Holdings, jointly and/or severally, as follows:

        a.      awarding actual damages as set forth above, plus interest;

        b.      awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

        c.      granting such other relief as this Court deems just.

COUNT 9
18 U.S.C. § 1964(c)
PLAINTIFFS v. ROBERT POWELL AND MORAN

250.    The foregoing paragraphs are incorporated.

251.    Robert Powell and Moran operated PLG through a pattern of racketeering as set forth above in violation of 18 U.S.C. § 1962(c).

252.    By reason Robert Powell and Moran's operating PLG through a pattern of racketeering as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

60

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Robert Powell and Moran, jointly and/or severally, as follows:

    a.    awarding actual damages as set forth above, plus interest;

    b.    awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

    c.    granting such other relief as this Court deems just.

COUNT 10
18 U.S.C. § 1964(c)
PLAINTIFFS v. ROBERT POWELL MORAN AND VISION HOLDINGS

253.    The foregoing paragraphs are incorporated.

254.    Robert Powell and Moran conspired, as set forth above, with the other members of the Association (other than PLG) to operate PLG through a pattern of racketeering as set forth above in violation of 18 U.S.C. § 1962(d).

255.    By reason of Robert Powell and Moran's conspiring, as set forth above, with the other members of the Association to operate  PLG through a pattern of racketeering as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Robert Powell Moran and Vision Holdings, jointly and/or severally, as follows:

    a.    awarding the amount of damages as set forth above, with interest

    b.    awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

    c.    granting such other relief as this Court deems just.

COUNT 11
18 U.S.C. § 1964(c)
PLAINTIFFS v. ROBERT POWELL

61

256.    The foregoing paragraphs are incorporated.

257.    Robert Powell operated Vision Holdings through a pattern of racketeering as set forth above in violation of 18 U.S.C. § 1962(c).

258.    By reason Robert Powell's operating Vision Holdings through a pattern of racketeering as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Robert Powell as follows:

       a.       awarding actual damages as set forth above, plus interest;

       b.       awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

       c.       granting such other relief as this Court deems just.

COUNT 12
18 U.S.C. § 1964(c)
PLAINTIFFS v. ROBERT POWELL, MORAN AND PLG

259.    The foregoing paragraphs are incorporated.

260.    Robert Powell conspired, as set forth above, with the other members of the Association (other than Vision Holdings) to operate Vision Holdings through a pattern of racketeering as set forth above in violation of 18 U.S.C. § 1962(d).

261.    By reason of Robert Powell's conspiring, as set forth above, with the other members of the Association to operate Vision Holdings through a pattern of racketeering as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Robert Powell, Moran, PLG, jointly and/or severally, as follows:

a.      awarding the amount of damages as set forth above, with interest;

b.      awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

c.      granting such other relief as this Court deems just.

COUNT 13
18 U.S.C. § 1964(c)
PLAINTIFFS v.
ROBERT POWELL, MORAN, PLG AND VISION HOLDINGS

262.    The foregoing paragraphs are incorporated.

263.    Robert Mericle operated or participated in the operation of Mericle Construction through a pattern of racketeering activity as set forth above.

264.    Robert Powell Moran, PLG and Vision Holdings conspired, as set forth above, with the other members of the Association to operate Mericle Construction through a pattern of racketeering as set forth above in violation of 18 U.S.C. § 1962(d).

265.    By reason of Robert Powell, Moran, PLG and Vision Holdings' conspiring, as set forth above, with the other members of the Association to operate Mericle Construction through a pattern of racketeering as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Robert Powell, Moran, PLG and Vision Holdings and Fishin', jointly and/or severally, as follows:

a.      awarding the amount of damages as set forth above, with interest;

b.      awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

63

c.      granting such other relief as this Court deems just.

COUNT 14
18 U.S.C. § 1964(c)
PLAINTIFFS v. DEFENDANTS ROBERT POWELL, MORAN, PLG AND VISION
HOLDINGS

266.    The foregoing paragraphs are incorporated.

267.    Conahan operated or participated in the operation of Beverage Marketing through a pattern of racketeering activity as set forth above.

268.    Robert Powell, Moran, PLG and Vision Holdings conspired, as set forth above, with the other members of the Association (except Beverage Marketing) to operate Beverage Marketing through a pattern of racketeering as set forth above in violation of 18 U.S.C. § 1962(d).

269.    By reason of Robert Powell, Moran, PLG and Vision Holdings' conspiring, as set forth above, with the other members of the Association to operate Beverage Marketing  through a pattern of racketeering as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Defendants, jointly and/or severally, as follows:

a.      awarding the amount of damages as set forth above, with interest;

b.      awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

c.      granting such other relief as this Court deems just.

COUNT 15
18 U.S.C. § 1964(c)
PLAINTIFFS v. ROBERT POWELL, MORAN, PLG AND VISION HOLDINGS

270.    The foregoing paragraphs are incorporated.

271.    Ciavarella and Conahan operated or participated in the operation of Pinnacle through a pattern of racketeering activity as set forth above

272.    Robert Powell, Moran, PLG and Vision Holdings conspired, as set forth above, with the other members of the Association (except Pinnacle) to operate Pinnacle through a pattern of racketeering as set forth above in violation of 18 U.S.C. § 1962(d).

273.    By reason of Robert Powell, Moran, PLG and Vision Holdings' conspiring, as set forth above, with the other members of the Association to operate Pinnacle through a pattern of racketeering as set forth above, the Plaintiffs have been injured in their property or business as set forth above.

WHEREFORE, Plaintiffs ask this Honorable Court to enter judgment in their favor and against Defendants, jointly and/or severally, as follows:

      a.    awarding the amount of damages as set forth above, with interest;

      b.    awarding treble the amount of actual damages set forth above, plus interest, and reasonable costs of this action, including attorneys' fees;

      c.    granting such other relief as this Court deems just.

COUNT 16
UNJUST ENRICHMENT
PLAINTIFFS v. ROBERT POWELL, MORAN, PLG, JANE SEBELIN, SEBELIN LAW
OFFICES, LANG, MATTHEW SLOCUM AND THE SLOCUM FIRM

274.    The foregoing paragraphs are incorporated.

275.    Robert Powell, individually and as president, director and shareholder of PLG wrongfully subjected PACC and WPACC to liability for the PACC Facility and WPACC Facility construction loans from S&T Bank and for the PACC and WPACC Addition construction loans from S&T Bank in order to induce Conahan and Ciavarella to make rulings in favor of Robert

Powell, Moran and PLG.

276.    Robert Powell signed the Registration and Commission Agreements which were central to the distribution of $2.15 million of the finder's fees in his capacity as attorney, and therefore, as president, director and shareholder of PLG.

277.    Robert Powell individually and as president, director and shareholder of PLG, and Moran individually and as officer, director and shareholder of PLG made the cash payments to Conahan in order to induce Conahan and Ciavarella to make rulings in favor of Robert Powell, Moran and PLG.

278.    Robert Powell individually and as president, director and shareholder of PLG, and Moran individually and as officer, director and shareholder of PLG agreed that Judge Conahan and his wife and Judge Ciavarella and his wife would receive either a townhouse or $300,000 in order to induce Conahan and Ciavarella to make rulings in favor of Robert Powell, Moran and PLG.

279.    Robert Powell promised a ghost job to the Court Administrator and contracts to the company owned by the Court Administrator's son to influence the outcome of *In Re Avoca Litigation*.

280.    Robert Powell paid for Judge Conahan, Judge Olszewski and a known drug dealer's flight to Florida to stay in the Florida Condominium in order in order to induce Conahan and Ciavarella to make rulings in favor of Robert Powell, Moran and PLG and to influence the outcome of *In Re Avoca Litigation.*

281.    Robert Powell, Moran and PLG maintained Powell's Private Bar in PLG's office building and drank there with Judge Conahan, Judge Toole, Judge Olszewski, Judge Conahan's tipstaff and the Court Administrator in order to induce Judge Conahan, Judge Toole, and Judge Olszewski, to make rulings in favor of Robert Powell, Moran and PLG.

282.   Robert Powell, Moran and PLG shared fees with Judge Toole, in order to induce Judge Toole to make rulings in favor of Robert Powell, Moran and PLG.

283.   Robert Powell and Moran made cash payments to President Judge Conahan for favorable rulings and to influence the entire Court of Common Pleas of Luzerne County.

284.   Robert Powell, Moran and PLG co-mingled money from PACC, WPACC, MAYS, Gladstone and Zappala with PLG money in order to pay for PLG's operating and litigation costs in the Court of Common Pleas of Luzerne County, Pennsylvania and elsewhere, particularly the costs of *In Re Avoca Litigation*.

285.   Robert Powell, PLG and Moran's actions set forth above enable them to obtain verdicts and/or judgments of multi-million dollars, including $3,411,141 million in *Slussar v. Laputka, Bayless, Ecker & Cohn, P.C.,* $3,258,500 in *Mancini v. Rotary Lift Co* $7,500,000 in *Holling v. Lovrinic* and a settlement of  approximately $500 million in *In Re Avoca Litigation*.

286.   As a result of Robert Powell, Moran and PLG's actions set forth, without disclosing the conflicts to opposing counsel, the fees that Robert Powell, Moran and PLG earned on all cases before the Court of Common Pleas of Luzerne County between 2001 and 2009 are proceeds of Robert Powell, Moran and PLG's fraud.

287.   Robert Powell, Moran and PLG so tainted the Court of Common Pleas of Luzerne County, Pennsylvania, that all fees that Robert Powell, Moran and PLG earned on all cases before the Court of Common Pleas of Luzerne County between 2001 and 2009 are proceeds of Robert Powell, Moran and PLG's fraud.

288.   After Judge Olszewski entered the orders confirming the arbitration awards, some or all of the Defendants in the *In Re Avoca Litigation* filed the Bankruptcy Case.

289.    As a result of a plan of reorganization and/or settlement in the Bankruptcy Case, the Tort Claims Trust has received or will receive settlements, totaling in aggregate approximately $5.0 billion for this purpose of settling various tort claims.

290.    Approximately $500 million of the Tort Claims Trust fund is designated for the *In Re Avoca* plaintiffs.

291.    PLG is to receive approximately $150 million to $200 million in contingent fees from the Tort Claims Trust for the *In Re Avoca Litigation* ("Avoca Fees")

292.    Upon information and belief, sometime in 2011, 2012 or 2013 the Tort Claims Trust paid to PLG an advance of approximately $3.0 million for fees due for Robert Powell, Moran and PLG's work in the *In Re Avoca Litigation* ("Avoca Fees").

293.    Upon information and belief, PLG paid approximately $1.2 million of the Avoca Fees advance to First Community National Bank, in partial repayment of a loan to PLG.

294.    Upon information and belief, PLG paid the remainder of the Avoca Fees advance to Robert Powell and/or to Moran.

295.    Four creditors of PLG sued the Trustee of the Tort Claims Trust in the Court of Common Pleas of Hamilton County, Ohio ("Ohio Court") to enjoin the Trustee from paying any Avoca Fees to PLG until it had paid the creditors.

296.    The Ohio Court preliminarily enjoined the Trustee from dispersing any Avoca Fees to PLG until the Trustee accumulated $9.0 million to pay three of the creditors.

297.    PLG and three creditors have settled the three creditors' claims against PLG in the Ohio Court. Upon information and belief PLG promised to pay the three creditors by using the expected payment of Avoca Fees from The Tort Claims Trust.

68

298.    The Ohio Court amended its preliminary injunction to prohibit the Trustee from paying any Avoca Fees to PLG until the Trustee accumulates $ 5.1 million to pay the fourth creditor.

299.    Robert Powell's sister-in-law, Gretchen Green, informed a third party that Robert Powell purchased a Maserati automobile for Debra Powell; purchased a Mercedes-Benz automobile for his son; is paying for the renovation of his parents-in-law's lake front home in New England, and Robert Powell is making frequent trips to Switzerland.

300.    A balloon payment of the balance of the WPACC loans on or about September 9, 2015, and a balloon payment of the balance of the PACC loans is due on or about September 9, 2015.

301.    Due to Robert Powell's, Moran's and PLG's theft of Plaintiffs' money, and PACC, WPACC and MAYS' expenditures for attorneys' fees and settlement of the Middle District Litigation, WPACC, PACC and MAYS must extend their loans and borrow additional money in order to remain in business

302.    Recently, the Bankruptcy Court approved final payment of Avoca Fees from the Tort Trust to PLG.

303.    The United States District Court for the Southern District of New York is expected to approve final payment of Avoca Fees from the Tort Claims Trust to PLG on or before July 16, 2014.

304.    Upon information and belief, the Trustee will begin to disperse the Avoca Fees on or before August 16, 2014.

305.    Moran is now the sole shareholder, director and officer of PLG.

306.    If this Court does not enjoin Moran and PLG from distributing the Avoca Fees that PLG receives from the Tort Claims Trust and impose a constructive trust upon the attorneys' fees that

69

PLG receives from the Tort Claims Trust to PLG, then PLG, Powell or Moran will dissipate and/or conceal the Avoca Fees.

307.    Robert Powell, Moran and PLG's extensive history in fraudulently dealing with Plaintiffs' money show that Robert Powell, Moran and PLG will dissipate and/or conceal the fees before Plaintiffs can obtain and enforce a judgment.

308.    Robert Powell's extensive history of creating off-shore corporations to hide assets from his wife; causing his interest in the Florida Condominium not to be of public record but to be privately noted as a mere right of use; moving his boat to Costa Rica; taking cash to Costa Rica; purchasing expensive automobiles and renovating his parents-in-law's home; and, trips to Switzerland show that Robert Powell, Moran and PLG will dissipate or conceal the attorney's fees before Plaintiffs can obtain and enforce a judgment

309.    Plaintiffs will have no adequate remedy at law.

WHEREFORE, Plaintiffs respectfully request this Honorable Court to enter judgment in their favor and against Robert Powell, Moran and PLG, jointly and/or severally, as follows:

a.    awarding the amount of damages set forth above, plus interest and attorneys' fees;

b.    awarding punitive damages;

c.    requiring Robert Powell, Moran and PLG, to account preliminarily and finally for the fees received or earned in and after 2001 until the date of the accounting, particularly the Avoca Fees;

d.    imposing a constructive trust in favor of Plaintiffs upon the fees received or earned from 2001 until the date of the accounting, particularly the Avoca Fees;

e.    preliminarily and permanently enjoining Robert Powell, Moran and PLG from disposing of the of the fees received or earned in or after 2001, particularly the Avoca Fees,

either directly, indirectly or by subterfuge such as directing payment of the Avoca Fees,

assigning the Avoca Fees, using the Avoca Fees as collateral; defaulting on loans that are

collateralized with or the Avoca Fees or otherwise encumbering the Avoca Fees;

      f.     preliminarily and permanently enjoining Moran and PLG to place all Avoca Fees

that PLG or Moran receives from the Tort Claims Trust or otherwise into a account in a financial

institution chosen Plaintiffs in trust for Plaintiffs;

      g.     requiring Robert Powell, Moran and PLG to disgorge to Plaintiffs the all

attorney's fees received or earned in and after 2001, particularly the Avoca Fees;

      h.     granting such other relief as this Court deems just.

COUNT 17
UNJUST ENRICHMENT
PLAINTIFFS v. ROBERT POWELL

310.    The preceding paragraphs are incorporated.

311.    All personal property and real property that Robert Powell has obtained since 2001 are

proceeds of the Defendants' case fixing activities set forth above.

WHEREFORE, Plaintiffs respectfully request this Honorable Court to enter judgment in their

favor and against Robert Powell, as follows:

      a.     awarding the amount of damages set forth above, plus interest and attorneys' fees;

      b.     awarding punitive damages;

      c.     requiring Robert Powell to account preliminarily and finally for Robert Powell's

share of the fees received or earned in or after 2001 , particularly the Avoca Fees;

      d.     requiring Robert Powell to account preliminarily and finally for all personal

property or real property that Robert Powell obtained in or after 2001 until the date of the

accounting;

71

e.      imposing a constructive trust in favor of Plaintiffs upon Robert Powell's portion of the fees received or earned from 2001, particularly the Avoca Fees;

f.      imposing a constructive trust in favor of Plaintiffs upon all personal property and real property obtained by Robert Powell in or after 2001;

g.      preliminarily and permanently enjoining Robert Powell from disposing of Robert Powell's share of the fees received or earned in and after 2001, particularly the Avoca Fees either directly, indirectly, or by subterfuge such as directing payment of the Avoca Fees, assigning the Avoca Fees, using the Avoca Fees as collateral; defaulting on loans that are collateralized with or the Avoca Fees or otherwise encumbering the Avoca Fees;

h.      preliminarily and permanently enjoining Robert Powell to place all Avoca Fees that he receives or has received from the Tort Claims Trust or otherwise into a account in a financial institution chosen Plaintiffs in trust for Plaintiffs;

i.      preliminarily and permanently enjoining Robert Powell from disposing any personal property or real property that Robert Powell obtained from 2001;

j.      requiring Robert Powell, to disgorge Robert Powell's share of the fees received or earned from 2001, particularly the Avoca Fees;

k.      requiring Robert Powell to disgorge all personal property and real property that Robert Powell obtained in and after 2001;

l.      granting such other relief as this Court deems just.

## COUNT 18
## UNJUST ENRICHMENT
### PLAINTIFFS v. ROBERT POWELL, DEBRA POWELL AND VISION HOLDINGS

312.    The preceding paragraphs are incorporated.

313.     Upon information and belief, all property, real and personal, that Robert Powell, Debra Powell and Vision Holdings have acquired in and after 2001 are proceeds of their case fixing activities set forth above.

WHEREFORE, Plaintiffs respectfully request this Honorable Court to enter judgment in their favor and against Robert Powell, Debra Powell and Vision Holdings as follows:

        a.        awarding the amount of damages set forth above, plus interest and attorneys' fees;

        b.        awarding punitive damages;

        c.        requiring Robert Powell, Debra Powell and Vision Holdings to account preliminarily and finally for all property, real and personal, that Robert Powell, Debra Powell and Vision Holdings acquired in and after 2001;

        d.        imposing a constructive trust in favor of Plaintiffs upon all property, real and personal, that Robert Powell, Debra Powell and Vision Holdings acquired in and after 2001;

        e.        preliminarily and permanently enjoining Robert Powell, Debra Powell and Vision Holdings from disposing of all property, real and personal, that Robert Powell, Debra Powell and Vision Holdings acquired in and after 2001;

        f.        requiring Robert Powell, Debra Powell and Vision Holdings to disgorge all property, real and personal, that Robert Powell, Debra Powell and Vision Holdings acquired in and after 2001;

        g.        granting such other relief as this Court deems just.

COUNT 19
UNJUST ENRICHMENT
PLAINTIFFS v. MORAN

314.     The preceding paragraphs are incorporated.

315.    All personal property and real property that Moran has obtained in and after 2001 are proceeds of the Defendants' case fixing activities.

WHEREFORE, Plaintiffs respectfully request this Honorable Court to enter judgment in their favor and against Moran, as follows:

a.    awarding the amount of damages set forth above, plus interest and attorneys' fees;

b.    awarding punitive damages;

c.    requiring Moran to account preliminarily and finally for Moran's share of the fees received or earned in and after 2001, particularly the Avoca Fees;

d.    requiring Moran to account preliminarily and finally for all personal property and real property that Moran has obtained in and after 2001 until the date of the accounting;

e.    imposing a constructive trust in favor of Plaintiffs upon Moran's share of the fees received or earned in and after 2001, particularly the Avoca Fees;

f.    imposing a constructive trust in favor of Plaintiffs on all personal property and real property that Moran has obtained in and after 2001 until the date of the accounting;

g.    preliminarily and permanently enjoining Moran from disposing of Moran's share of the fees received or earned in and after 2001, particularly the Avoca Fees either directly, indirectly, or by subterfuge such as directing payment of the Avoca Fees, assigning the Avoca Fees, using the Avoca Fees as collateral; defaulting on loans that are collateralized with or the Avoca Fees, or otherwise encumbering the Avoca Fees;

h.    preliminarily and permanently enjoining Moran to place all Avoca Fees that he receives or has received from the Tort Claims Trust or otherwise into a account in a financial institution chosen Plaintiffs in trust for Plaintiffs;

74

      i.      preliminarily and permanently enjoining Moran from disposing of any personal property or real property that Moran has obtained in and after 2001 until the date of the accounting;

      j.      requiring Moran to disgorge Moran's share of the fees received or earned in and after 2001;

      k.      requiring Moran to disgorge all personal property and real property that Moran has obtained in and after 2001 until the date of the accounting;

      l.      granting such other relief as this Court deems just.

Respectfully submitted,

/s/ Bernard M. Schneider
Bernard M. Schneider
Counsel for Plaintiffs

PA ID #32245
BRUCKER SCHNEIDER & PORTER
FIRM ID # 789
300 Weyman Road
Suite 320
Pittsburgh, PA 15236
(412) 881-6620 (telephone)
bmschn@aol.com (e-mail address)